**Betty OWENS and Rebecca Owens by her next friend Betty Owens, Plaintiffs,**

v.

**NACOGDOCHES COUNTY HOSPITAL DISTRICT, d/b/a Memorial Hospital, et al., Defendants.**

**Civ. A. No. L–87–97–CA.**

United States District Court, E.D. Texas, Lufkin Division.

June 26, 1990.

Brenda Willett (Beverly Luna, of counsel), East Texas Legal Services, Nacogdoches, Tex., for plaintiffs.

David L. Allen, Zeleskey, Cornelius, Rogers, Hallmark & Borgfeld, Lufkin, Tex., for defendants.

## MEMORANDUM OPINION

JUSTICE, District Judge.

On August 3, 1987, Rebecca Owens, a sixteen year old indigent resident of Nacogdoches County whose pregnancy was full term, began to experience labor pains. She went to the emergency room at Memorial Hospital in Nacogdoches at approximately 3:00 p.m. After initial processing, she was taken to the Labor and Delivery room, where she was examined by Dr. Bruce Thompson, who was under contract with Memorial Hospital to provide obstetric and gynecological care to indigent pregnant women. After approximately one-half hour, Dr. Thompson discharged Ms. Owens with instructions that she go to John Sealy Hospital in Galveston, Texas—a facility approximately two hundred miles and four hours driving time away—to deliver her baby. On the night of August 3, this court, upon the petition of Rebecca Owen's mother and next friend Betty Owens, issued a temporary restraining order enjoining Memorial Hospital from refusing to admit Rebecca Owens for the purpose of

delivering her baby. On August 7, 1987, four days after the issuance of the temporary restraining order, Rebecca Owens was admitted to Memorial Hospital, where Dr. Bruce Thompson delivered her baby. Plaintiff has brought suit against the hospital and its board of directors in their official capacities, seeking damages, and declaratory and injunctive relief pursuant to 42 U.S.C. § 1395dd, the Emergency Medical Treatment and Active Labor Act, which forms part of the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA).

It is clear beyond peradventure first, that no attempt was made by defendant hospital to comply with the transfer requirements of § 1395dd; second, that the sole reason for the instruction to Rebecca Owens to go to John Sealy Hospital was that she was without funds; third, that this action constituted "dumping," the very evil which § 1395dd was designed to prevent; fourth, that this incident was not an isolated one, but part of a pattern of dumpings of indigent patients that continued virtually until the time of trial in this civil action—a pattern caused by the unwillingness of defendant hospital to take the steps requisite for adequate performance of its statutory responsibilities for the care of indigent patients under both federal and state law; and finally, that what occurred to Rebecca Owens is capable of repetition, yet might evade review. Accordingly, judgment in this civil action will be entered for plaintiff, damages and attorney's fees in accordance with the stipulation of the parties will be awarded to her, and defendant hospital will be permanently enjoined from refusing her delivery in any future pregnancy in violation of 42 U.S.C. § 1395dd.

### I. Background—42 U.S.C. § 1395dd

The Emergency Medical Treatment and Active Labor Act, sometimes referred to as the Anti–Dumping Act, was enacted by Congress as part of the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA), and codified at 42 U.S.C. § 1395dd. The Act was a response to a national epidemic of "dumping," the practice by hospitals of refusing emergency care to indigent

patients outright or of transferring such patients, without regard to the necessity for stabilizing their condition, to other—typically public—hospitals. *See generally McClurg, Your Money Or Your Life: Interpreting the Federal Act against Patient Dumping,* 24 Wake Forest L.Rev. 173 (1989); Note, *Preventing Patient Dumping: Sharpening the COBRA's Fangs,* 61 N.Y.U.L. Rev. 1186 (1986).

The extent and severity of patient dumping has been increasing in recent years, and the act is the latest governmental attempt to deal with the phenomenon. Other attempts have been made both by Congress—notably in the Hill–Burton Act, which requires hospitals which have received certain Federal funds to provide necessary emergency care to all residents of the community served by the hospitals—and by various state legislatures, including that of the State of Texas.

The rationale behind the bill is plainly explained in the legislative history by the Report of the House Committee on the Judiciary:

> In recent years there has been a growing concern about the provision of adequate emergency room medical services to individuals who seek care, particularly as to the indigent and uninsured. Although at least 22 states have enacted statutes or issued regulations requiring the provision of limited medical services whenever an emergency situation exists, and despite the fact that many state court rulings impose a common law duty on doctors and hospitals to provide necessary emergency care, some are convinced that the problem needs to be addressed by federal sanctions.

1986 U.S.Code Cong.Admin.News Vol. 3, p. 728.

To address these problems, 42 U.S.C. § 1395dd requires that any hospital with an emergency room must provide a medical screening examination to any patient who appears complaining of an emergency medical condition. It further provides that such patients cannot be transferred to another facility in an unstable condition, and requires that such a transfer be "appropriate." The guidelines for an appropriate transfer are that the physician certify in writing that the benefits of such transfer outweigh the risk, that the transferring hospital provide the medical treatment necessary to minimize the risk to the health of the patient (which includes, in the case of a woman in labor, the health of the child as well as the mother), that the transferring hospital send the relevant records in its possession with the patient, that the transferring hospital obtain the assurance of the receiving hospital that the receiving hospital has space and facilities for the patient and has accepted the transfer, and that the transfer "is effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures."

In order to make clear what the responsibilities of the physician and the transferring hospital are, the act includes definitional sections which establish what is meant by an "emergency medical condition" and "active labor." For the purpose of this civil action, the relevant section is 42 U.S.C. § 1395dd(e)(2),[1] and particularly 42 U.S.C. § 1395dd(e)(2)(C):

> (2) The term "active labor" means labor at a time at which—
>
> (A) delivery is imminent,
>
> (B) there is inadequate time to effect safe transfer to another hospital prior to delivery, or
>
> (C) a transfer may pose a threat to the health or safety of the patient or the unborn child.

The definitional section of the act clearly establishes the basis for judging the acts of the physician and hospital. That is, the physician cannot, by a mere assertion that in his judgment neither an emergency

---

**1.** Certain changes in the definitional section of the act have been made by an act of Congress dated December 19, 1989. Such changes—which effectively subsumed the first definition of "active labor" into the second and third—would not affect the outcome of this civil action, and at any rate do not take effect until July 1, 1990. This civil action is, accordingly, governed by the act as it was before the amendment.

medical situation nor active labor exists, evade or negate the plain intent of the statute. To hold otherwise would render the statutory scheme merely precatory, which, as the above citation of the history of the act makes clear, is not what Congress intended.

The act provides for a variety of sanctions to enforce its provisions, including termination or suspension of the defendant hospital's medicare provider agreement, civil monetary penalties, and the establishment of causes of action for both patients who are dumped and hospitals which receive dumped patients. The basis for this civil action is the first of the civil enforcement sections, § 1395dd(d)(3)(A):

> (A) Personal harm. Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

The cause of action established by this section is plainly a Federal one, cognizable in a United States District Court. *Bryant v. Riddle Memorial Hospital*, 689 F.Supp. 490 (E.D.Pa.1988); *Stewart v. Myrick*, 731 F.Supp. 433 (Kansas 1990). The statute permits a patient injured by dumping to recover for her own injuries, and essentially to vindicate the purpose of the statute, which as it was described by Judge Newcomer in his scholarly discussion of Congressional intent, is to "establish ... a series of federal guidelines which medicare hospitals having emergency medical care must follow to prevent the problem of patient dumping." *Bryant v. Riddle Memorial Hospital*, 689 F.Supp. 490, 493 (E.D. Pa.1988). Accordingly, this court has federal question jurisdiction over this civil action, and Rebecca Owens has standing to maintain it.

## II. Narrative of Events

Rebecca Owens, a sixteen year old indigent female resident of Nacogdoches County, was pregnant with her first child in 1987. During the course of her pregnancy she received pre-natal care and counseling from the East Texas Health Services Clinic in Lufkin, Texas, under the auspices of the Maternal and Infant Health Improvement Act (M.I.H.I.A.) program, a program established by the State of Texas to provide such services for indigent, and especially adolescent, expectant mothers.

All pertinent records concerning Rebecca's pre-natal care were turned over to the Owens family by the clinic at the end of July, 1987. Further, the East Texas Health Services clinic advised the Owenses "from day one that [Rebecca] could go to any county hospital," to deliver her child. Testimony of Betty Owens.

On the afternoon of August 3, 1987, Rebecca Owens began to experience labor pains. At approximately 3:00 p.m., she went to the emergency room at Memorial Hospital. After initial processing, she was taken to the Labor and Delivery room, where she was examined by Dr. Bruce Thompson.

There are two factual controversies about this interview. Rebecca Owens asserted in her testimony that she gave the physician her M.I.H.I.A. records, and that she never indicated a desire to go to John Sealy Hospital to deliver her child. Testimony of Rebecca Owens. Dr. Thompson testified that no records were given him, and that Rebecca Owens gave him to understand that she intended to drive to John Sealy Hospital and "was coming to the hospital for me to make a determination on whether or not it would be relatively safe for her to go" to Galveston. Deposition of Dr. Bruce Thompson, p. 73. Certain hospital records were also introduced which would seem to support Dr. Thompson's version of events, as would the testimony of Barbara Davidson, the admitting nurse. However, since, as noted *infra,* a grave suspicion attaches to the authenticity of one of these hospital records and to Ms. Davidson's credibility, since Rebecca Owens's actions are entirely inconsistent with Dr. Thompson's version of the conversation and entirely consistent with her own version, and since—considering their relative claims in the light of the consistency of

their testimony and their respective demeanor—the court finds Rebecca Owens a more credible witness than Dr. Thompson, the court finds it established as a matter of fact that the M.I.H.I.A. records were given to the hospital, and that Rebecca Owens asked not to be shipped two hundred miles to Galveston, but rather to be admitted to deliver her baby at the hospital at which she presented herself.

In the course of his examination, Dr. Thompson relied upon the notes of the nurse who had made the preliminary examination for his conclusion that her water bag had not burst and her membranes were intact. He did not check this conclusion by performing an acidity test, a test which by his testimony would have taken "minutes" and cost "a few dollars." Deposition of Dr. Bruce Thompson, pp. 195, 253. The whole of his instruction to Rebecca Owens was to go to Galveston, to the University of Texas Medical Branch at John Sealy Hospital, and not to speed getting there.

Dr. Thompson's diagnosis on August 3, 1987, was that Rebecca Owens was in early, latent labor. Deposition of Dr. Bruce Thompson, p. 145. Under cross-examination, Dr. Thompson repeatedly admitted that Rebecca Owens was not in false labor. Deposition of Dr. Bruce Thompson, pp. 242, 244.

Dr. Thompson did not call John Sealy Hospital to alert them that Rebecca Owens was on her way, and to make certain that John Sealy had a bed for her and was willing to accept her. He did not write a transfer memo, listing in writing his reasons for judging that the transfer's benefits outweighed its risks. He did not provide any medical treatment to minimize the risks to the mother and baby, unless one counts as medical treatment his advice that Rebecca Owens not speed to Galveston. He did not offer, or provide, an ambulance and crew or any other necessary and medically appropriate life support measures. Indeed, when asked how she was to transport herself to Galveston, he shrugged his shoulders. He does not appear to have provided her with the medical records to give John Sealy Hospital, which, even were one to accept his claim that he did not have the M.I.H.I.A. records, would have included those records generated in the emergency and labor and delivery room at Memorial on August 3, 1987.

After being told that she would not be admitted to the hospital, Rebecca Owens was in a state of some fear and confusion. She sat in the hallway at the hospital until approximately 5:30 p.m., when a nurse came up to her and told her she was supposed to be on her way to Galveston. At that point, she walked across the street to her mother's place of employment. According to Betty Owens, her daughter was "doubled over in pain." Testimony of Betty Owens. Thereafter she went to the office of East Texas Legal Services where she filled out some papers, including an application for pregnancy care. She then went to her mother's house, and subsequently to the home of Gary Dempsey, the father of her child. At some point during the afternoon, she and Geneva Dempsey, Gary Dempsey's aunt, timed her contractions. According to their calculations, the contractions were approximately 3 minutes apart.

That evening, Rebecca Owens and Gary Dempsey, who were apparently unaware that the efforts of East Texas Legal Services to obtain a temporary restraining order in this civil action were bearing fruit, went to the home of Gary Dempsey's grandfather, from whom they borrowed $100.00 for the trip to Galveston, and departed for John Sealy Hospital in the middle of the night in a 1976 Pinto in bad condition. They arrived on the morning of August 4, 1987. At John Sealy, according to Rebecca Owens's testimony, the doctors examined her to see the extent of her dilation and had her walk around. She was told she would not be admitted because she was not dilated to three centimeters. The medical records of John Sealy Hospital reflect that she was in early labor, and that the fundal height of her baby—one of the measures by which the size of the baby in the womb is determined—was thirty-three centimeters.

While Rebecca Owens and Gary Dempsey were driving to Galveston, the temporary restraining order enjoining Memorial Hospital from refusing to deliver her child already referred to was issued. Dr. Thompson became aware of the temporary restraining order at midnight on August 3, but did not look at it until the following day. Deposition of Dr. Bruce Thompson, p. 151. He was, as a result of seeing the temporary restraining order, fearful of the possibility of a malpractice suit. He did not want to deliver Rebecca Owens. He admits to anger at the prospect of having to deliver Rebecca Owens. Deposition of Dr. Bruce Thompson, pp. 151–152.

Rebecca Owens became aware of the temporary restraining order after her return from Galveston. Her bag of water ruptured on August 7. She returned to Memorial that afternoon. Dr. Thompson administered Oxytocin to speed her contractions, and Christopher Dempsey was born at 5:52 p.m. on August 7, 1987. When Christopher was born, the records indicate a nuchal cord—that is, the umbilical cord was wrapped around his neck. According to Dr. Thompson, it is not certain whether the cord was around the baby's neck on August 3. Deposition of Dr. Bruce Thompson, p. 255.

According to the testimony of Rebecca Owens and Mamie Dempsey, the mother of Gary Dempsey, Dr. Thompson engaged in an abusive tirade against Rebecca Owens in the delivery room, denouncing her for involving a lawyer and a federal court. Dr. Thompson does not deny that the incident occurred, but avers that he has no memory of it. Deposition of Dr. Bruce Thompson, pp. 175–176. Considering the weight of the evidence and the relative credibility of the parties, the court finds it established as a matter of fact that Dr. Bruce Thompson engaged in the abusive and vilificatory language alleged.

As a result of the acts of Memorial Hospital and Dr. Bruce Thompson, Rebecca Owens asserts that she suffered great mental anguish and fear, both on the night of August 3 and 4 of 1987, during the birth of her child, and thereafter, and remains gravely concerned as to whether she can deliver future children at Memorial Hospital. The court accepts the testimony of Rebecca Owens, and finds as a matter of fact that sending Rebecca Owens, a sixteen year old girl pregnant with her first child who was experiencing labor pains, to a hospital two hundred miles away in a 1976 Ford Pinto, did occasion her great fear, mental anguish, and emotional distress.

### III. Transfer Requirements Under 42 U.S.C. § 1395dd

Defendants urge that Rebecca Owens was not "transferred" within the meaning of 42 U.S.C. § 1395dd. At first glance, this argument conflicts with the statutory language. The definitional section of the Anti–Dumping Act defines "transfer" as follows:

(5) The term "transfer" means the movement (including the discharge) of a patient outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly with) the hospital, but does not include such a movement of a patient who (A) has been declared dead, or (B) leaves the facility without the permission of any such person.

The contractual affiliation of Dr. Bruce Thompson and Memorial Hospital is uncontested. Dr. Thompson admits that he directed Rebecca Owens to go to Galveston, and the records so indicate. Rebecca Owens is not dead, and did not leave Memorial Hospital without permission on the night of August 3, 1987. That the order to go to Galveston constituted a transfer appears plain.

Defendants, however, appear to be of a different view. They contend that because Rebecca Owens was a M.I.H.I.A. patient, and because the University of Texas–Medical Branch at John Sealy Hospital in Galveston had, as Memorial Hospital did not, a contract to provide delivery services under M.I.H.I.A., Rebecca Owens was a patient of John Sealy Hospital; hence, they argue that the direction to go to John Sealy cannot be a transfer. The logic of the argument is best expressed in a colloquy be-

tween defendants' counsel and Dr. Thompson:

Q. ... Was this transfer the night of August 3, 1987 a medical transfer?

A. Not—I felt—no, I don't feel like it was.

Q. Whose patient was she the night of August 3, 1987?

A. She was a patient of the MIHIA program and a patient of John Sealy Hospital, Galveston.

Q. Well, you can't transfer a patient from John Sealy Hospital to John Sealy Hospital, can you?

A. No, not technically, you can't.

Deposition of Dr. Bruce Thompson, p. 226.

Contrary to defendants' assertions, however, Rebecca Owens was not a patient of John Sealy Hospital on August 3, 1987. She had not presented herself for admission to John Sealy Hospital. She had come to Nacogdoches Memorial Hospital. She was obviously Memorial's patient, and defendants' artful quibbling on this point avails them nothing. The definition of "transfer" unquestionably encompasses the direction to proceed to Galveston.

This is yet clearer when one considers that Rebecca Owens had never been a patient of John Sealy Hospital. She had received no treatment or care at John Sealy Hospital. All her pre-natal care had occurred at the East Texas Health clinic in Lufkin, Texas. The blanket equation that a M.I.H.I.A. patient was a high risk patient to be sent to Galveston on which Dr. Thompson relied had no necessary warrant in her case, and was, as he admitted, not based on his examination of her. Deposition of Dr. Bruce Thompson, p. 100.

Indeed, according to the written deposition of plaintiffs' expert witness Dr. David Smith, Chief Executive Officer and Medical Director for the community oriented primary care program at Parkland Memorial Hospital in Dallas, Texas, "the fact that Galveston, the University of Texas Medical Branch was the contractor under M.I.H.I.A. for the area around Nacogdoches does not justify a blanket statement that an individual must go to Galveston for delivery." Deposition of Dr. David Smith, p. 4.

(It is found that Dr. Smith's testimony is particularly credible because he was involved in the effort to enact M.I.H.I.A., and has been associated with M.I.H.I.A. providers both in Brownsville, Texas and at Parkland.) Written Deposition of Dr. David Smith, p. 3.

Given that the order to go to Galveston was a transfer order, it is apparent that it violated all the standards set down for a transfer in the act, as the narrative of events has already noted. Dr. Thompson was, by his own admission, aware of the procedural and substantive requirements for a transfer, though uncertain that those were legal requirements. Deposition of Dr. Bruce Thompson, p. 171. He knew he was supposed to call the receiving hospital to get permission for the transfer. He knew he was supposed to make copies of the relevant records. He did, as a matter of routine, write a memorandum outlining the benefits versus the risks of a transfer. Yet he drafted no such transfer memorandum in the case of Rebecca Owens. Deposition of Dr. Bruce Thompson, p. 173. Nor does the record reflect that he took any other action which was required by 42 U.S.C. § 1395dd.

█ As to the requirement of providing adequate transportation for the transfer, it is uncontroverted that no transport was provided. At best, the defendants rely on a document which asserts that according to Rebecca Owens, she had a car. Even were one willing to accept the assertions of this document, a 1976 Ford Pinto with no medical equipment, whose only other occupant besides the patient is her boyfriend, is not the equivalent of an ambulance for the purposes of the Antidumping Act.

Dr. Pamela Schute, a board-certified obstetrician and gynecologist practicing at the Kaiser Permanente Health Maintenance Organization in Dallas, Texas, with previous experience in indigent health care in Alameda County, California, testified that the standard of care for appropriate transfer if a patient is suspected of being in labor would require a sterile delivery set and a person able to deliver the baby in an

ambulance. Deposition of Dr. Pamela Schute, p. 19. This testimony is corroborated by Dr. Smith, who described the transport as "an inappropriate transport, which I can't even characterize as a medical transport. The best term is the one you've used legislatively, it's dumping." Oral Deposition of Dr. David Smith, p. 33. This testimony is found credible.

## IV. Reasons for the Transfer

■ Defendants offer two arguments as reasons for the transfer of Rebecca Owens on August 3, 1987. First, they argue that Rebecca Owens announced that it was her intent to go to John Sealy Hospital when she came to Memorial. Second, they argue that it was preferable for Rebecca Owens, because she was a M.I.H.I.A. patient, to deliver at John Sealy Hospital since it is a Level–III hospital with a neonatal unit. Neither of these arguments is availing.

Rebecca Owens, in both her direct and her cross-examination, repeatedly and strenuously denied having told anyone at Memorial Hospital that she was on her way to Galveston. Nor, despite the assertions of defense counsel, is her testimony inconsistent with the previous deposition testimony. Deposition of Rebecca Owens, p. 25. Moreover, her testimony is entirely consistent with her actions on August 3. Had Rebecca Owens intended to go to Galveston, it would not have made sense for her to remain in the hallway of Memorial Hospital for two hours or to go to East Texas Legal Services to get an attorney, who first attempted to negotiate with the hospital and then sought a temporary restraining order. Hence, her testimony is deemed truthful. Under cross-examination, Dr. Bruce Thompson admitted that such actions indicated a desire to deliver at Memorial. Deposition of Dr. Bruce Thompson, pp. 73–74. He further admitted that it is not "a typical desire for a woman in labor to drive four hours away to deliver their baby." Deposition of Dr. Bruce Thompson, p. 75. Rebecca Owens's testimony is corroborated by that of her mother, to which reference has already been made, and that of Gary Dempsey.

Many of the defendants' claims that—despite her testimony, the testimony of her mother and Gary Dempsey, and the inferences any person of ordinary common sense would make based on her actions on August 3, 1987—Rebecca Owens in fact wished to go to Galveston and asserted that she had adequate transportation to go to Galveston are based on a document labelled as an "OB outpatient observation record" for Rebecca Owens on August 3, 1987 and listed as part of Defendants' Exhibit 1. (The same record is also listed as part of Plaintiff's Exhibit 2.) However, as the cross examination of the nurse who alleged that she had prepared the document demonstrated, there are clear indications that the statements on which the defense relies were written in after the fact, and a very strong suggestion attaches that statements in this document were deliberately fabricated for the purposes of this litigation. Cross-examination of Barbara Davidson, R.N. Accordingly, the court gives no credence to the document, to the testimony which sought to authenticate it, or to any testimony based upon it.

Given the relative credibility of the witnesses and the inferences that may be drawn from the behavior of Rebecca Owens on August 3, 1987, the court finds that as a matter of fact, Rebecca Owens expressed no intent to go to Galveston, Texas to deliver her child, but rather requested that she be delivered at Memorial Hospital.

■ Defendants' other principal argument is that the decision to send Rebecca Owens to Galveston was justified in light of the fact that the facilities of John Sealy Hospital, particularly the neo-natal unit, were more appropriate for Rebecca Owen's delivery than those of Memorial Hospital. According to the testimony of Dr. Bruce Thompson, it was for this reason that he felt the benefits of sending Rebecca Owens to Galveston outweighed the risks of sending her.

Dr. Thompson testified that his conclusion that there were high risks associated with Rebecca Owens's delivery was based on the fact that she had been a M.I.H.I.A. patient. Deposition of Dr. Bruce Thomp-

son, p. 72. He further testified that had she not been a M.I.H.I.A. patient, he would not have sent her to Galveston. Deposition of Dr. Bruce Thompson, pp. 88–89.

When asked to list the risks he thought possible on the basis of the fact that Rebecca Owens was a M.I.H.I.A. patient which would have justified in sending her to Galveston, Dr. Thompson, after some hesitation, was able to list four problems: that there were problems that might be associated with poor nutrition; that there was a potential for Rebecca Owens to have a growth-retarded baby; that there was a possibility that Rebecca Owens might require a Caesarean section; and that it was possible that Rebecca Owens might have a sexually transmitted disease such as Acquired Immune Deficiency Syndrome (AIDS). Deposition of Dr. Bruce Thompson, pp. 96–98. Under further questioning, however, Dr. Thompson admitted that poor nutrition was not corrigible during labor. Deposition of Dr. Bruce Thompson, p. 100. He further agreed that he was fully capable of performing a Caesarean section, had Rebecca Owens required one. Deposition of Dr. Bruce Thompson, pp. 103–104. He testified that, if a woman whom he thought likely to require a Caesarean section were to go into labor, it "would not be the thing to do" to have her drive to a hospital four hours away, because there were serious risks that, should the mother give birth on the road in such a situation, either the mother or the child, or both, could die. Deposition of Dr. Bruce Thompson, pp. 106, 111–112.

Dr. Thompson further admitted that he had no reason on August 3, 1987, to suspect that Rebecca Owens had AIDS, and knew of no reason related to AIDS to transfer Rebecca Owens. Deposition of Dr. Bruce Thompson, pp. 110–111. He finally relied on one possible risk which would justify a transfer to John Sealy Hospital—the possibility that Rebecca Owens's child was a growth-retarded, or small for gestational age (SGA) baby. On further examination, however, Dr. Thompson testified that Memorial Hospital could have provided the nutrition necessary to counteract growth retardation, and that he could have

competently delivered an SGA baby at Memorial. Deposition of Dr. Bruce Thompson, pp. 103, 116. He further testified that it would be better for an SGA baby to be born at Memorial Hospital than in a car bound for Galveston. Deposition of Dr. Bruce Thompson, p. 247. He stated at least twice that SGA was "not a concern of [his] back August 3rd" and was not a medical reason to transport on August 3, 1987. Deposition of Dr. Bruce Thompson, pp. 131, 133. Finally, he admitted that in fact Rebecca Owens had not required the services of the neo-natal clinic at John Sealy Hospital. Deposition of Dr. Bruce Thompson, p. 252.

Weighed against Dr. Thompson's claim of the benefit of transfer, which boils down to a statement that John Sealy Hospital "had a little bit more to offer" than Memorial, are the risks identified by Drs. Schute, Smith, and F. Barry Roberts as well as Dr. Thompson himself. Deposition of Dr. Bruce Thompson, p. 164.

As Dr. Thompson testified, "You don't want [women] delivering in the car ... if you can help it." Deposition of Dr. Bruce Thompson, p. 183. According to Dr. Smith, the risks of in-travel delivery include separation of the placenta, drop in fetal heart rate, aspiration by the fetus of the meconium or stool, and nuchal cords. Deposition of Dr. David Robert Smith, pp. 17–18. Dr. Pamela Schute testified that there were also such dangers as cord prolapse and hemorrhaging. Deposition of Dr. Pamela Schute, p. 12. Dr. Thompson agreed that in-transit delivery would pose such risks as hemorrhaging, cord prolapse, separation of the placenta, and the death of both mother and child. Deposition of Dr. Bruce Thompson, pp. 176–177. Dr. F. Barry Roberts, Dr. Schute, and Dr. Smith all testified that the risks of a private car transport from Nacogdoches to Galveston far outweighed any possible benefit of the transfer. Deposition of Dr. F. Barry Roberts, pp. 56–57; Deposition of Dr. Pamela Schute, pp. 10, 12–13, 16, 66, 72; Oral Deposition of Dr. David Robert Smith, pp. 16–18, 33. Dr. Smith analogized sending a woman in the situation of Rebecca Owens on August 3,

1987 to a hospital four hours away to playing Russian Roulette. Oral Deposition of Dr. David Robert Smith, p. 18. The court concurs, and finds this analogy apt.

The explanations proffered by Dr. Thompson for the transfer are best described as inadequate, stumbling, and incredible. The assertion that the risks associated with sending a frightened adolescent girl on a four hour trip by private car are markedly less severe than those of admitting her for delivery, when the only serious medical risk the physician identifies is stunted growth—a risk which, under further questioning, he then admits was not his concern at the time—is entirely unworthy of credence.

The relevant standard to be considered in judging whether the actions of Dr. Thompson as an agent of Memorial Hospital violated the Antidumping Act is the definitional section already cited herein, 42 U.S.C. § 1395dd(e)(2)(C), whether "a transfer may pose a threat to the health or safety of the patient or unborn child," since according to the testimony of Dr. Bruce Thompson, Rebecca Owens was in early or latent labor when he saw her on August 3, 1987. Deposition of Dr. Bruce Thompson, p. 145. Dr. Thompson repeatedly agreed that Rebecca Owens's condition was labor, not false labor. Deposition of Dr. Bruce Thompson, pp. 242, 244.

Much of the defendants' case rests on the fact that Rebecca Owens did not deliver her child for four days. Defendants, for example, have placed great emphasis on the following exchange between defense counsel and plaintiff's expert Dr. Schute:

Q. That wasn't what I asked. I just asked did she deliver four days later?

A. Yes, she delivered four days later, so she wasn't in labor when they told her to go out driving out there.

Q. She was not in labor?

A. Well, according to that, no.

Deposition of Dr. Pamela Schute, p. 69.

■ It is, however, clear from the context of Dr. Schute's testimony that she means that the birth of Rebecca Owens's child was not imminent. As the court attempted to make clear to the defense in denying its motion for summary judgment, imminent childbirth does not exhaust the statutory meaning of active labor pursuant to 42 U.S.C. § 1395dd. When it is established, as it is by Dr. Thompson's testimony, that the woman was in labor, the inquiry turns to the questions of whether there was sufficient time for a transfer, and most pertinently to the question of whether the transfer posed undue risk to mother and child.

In this case, the risks of the transportation were severe. According to the testimony of all the medical witnesses, including Dr. Thompson, there was a risk that, had the baby been born on the side of the road, both mother and child might have died. The transfer was wholly without supervision; so far as can be determined, nobody in the 1976 Pinto knew the faintest thing, in the familiar words of Prissie, "about birthing babies." *See* M. Mitchell, *Gone With The Wind.* Had the child been born in the car, and had the cord been wrapped around its neck on August 3, as it was on August 7, Christopher Dempsey might well have strangled at birth.

There is no reason to recite yet again the dangers which all the physicians agreed would have attended a birth somewhere on the two hundred miles of highway between Nacogdoches and Galveston. They are all a matter of record. Not even Dr. Thompson, when pressed, denies that they exist. It is found that, as a matter of fact, the transfer by private car of plaintiff Rebecca Owens from Nacogdoches to Galveston while she was undergoing labor pains on the night of August 3, 1987, did pose significant and wholly unnecessary risks to both Rebecca Owens and her unborn child.

■ Moreover, it is transparent that the sole reason for the illegal transfer was Rebecca Owens's indigency. Dr. Thompson repeatedly admitted that, had Rebecca Owens not been a M.I.H.I.A. patient, she would not have been sent to Galveston. Deposition of Dr. Bruce Thompson, pp. 88–89. He was aware that Rebecca Owens's status as a M.I.H.I.A. patient indicated her indigency. Deposition of Dr. Bruce

Thompson, p. 80. He contended that her status as a M.I.H.I.A. patient gave him a medical basis for his determination that she was a high-risk patient who ought to be sent to Galveston. Deposition of Dr. Bruce Thompson, p. 72. However, when he was pressed, his reasons became flimsier and flimsier, as already noted. He admits that he has never transferred a paying patient by private car. Deposition of Dr. Bruce Thompson, pp. 154–156.

In her deposition, Dr. Pamela Schute asked, "What was it about Rebecca Owens that she had to go four hours away?" Deposition of Dr. Pamela Schute, p. 67. It is found, as a matter of fact, that the reason for the transfer was that Rebecca Owens was without funds. The flimsiness of the pretense that there was any reason other than her poverty to send the plaintiff to Galveston is apparent.

■ Further, since under substantive Texas personal injury law, which governs pursuant to 42 U.S.C. § 1395dd, proof of physical injury is not a prerequisite for recovery for negligent infliction of mental anguish, *St. Elizabeth Hospital v. Garrard*, 730 S.W.2d 649 (Tex.1987), and since it has already been found that the decision to transfer her to Galveston caused Rebecca Owens severe mental anguish, it is found that the violation of the Antidumping Act by Memorial Hospital through its agents Dr. Bruce Thompson caused Rebecca Owens personal injury within the meaning of the statute.

Pursuant to the joint stipulation of the parties regarding damages entered into on the morning trial commenced, the court assesses against Memorial Hospital the sum of $25,000.00 in damages and the sum of $25,000.00 in attorneys' fees.

V. Declaratory and Injunctive Relief

■ By its terms, the Anti–Dumping Act provides not only for damages for personal injury, but also for "such equitable relief as is appropriate." Accordingly, plaintiff Rebecca Owens has moved for injunctive relief as well as declaratory relief pursuant to the 28 U.S.C. § 2201.

Defendants demur, arguing that the relief sought is based upon speculation, and that there is no "real or immediate threat" of future injury by the defendants. *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1982). The defendants argue that, since Rebecca Owens is not now pregnant, she has no standing to maintain her claims and there is no justiciable controversy in this regard.

Defendants' argument is unavailing. As plaintiff correctly points out, the appropriate standard here is whether the complained of acts are capable of repetition, yet may evade review. Given that the wrongs sought to be addressed by the Antidumping Act are precisely not continuing but episodic, since that is the nature of emergency medical conditions and of childbirth, it simply does not make sense to assert that Rebecca Owens ceased to have standing for equitable relief when she gave birth. To so hold would render the inclusion of equitable relief in the statute mere surplusage. *See Maziarka v. St. Elizabeth Hospital*, 1989 WL 13195, 1989 U.S. Dist. Lexis 1536.

In any event, defendants are wrong as a matter of fact regarding the claim that plaintiff has not shown a real and immediate threat of future injury. Plaintiff's evidence demonstrates a long-standing pattern of patient dumping, caused by staffing policies that in the opinion of a series of medical experts would inevitably lead to standards of care at Memorial Hospital that patently did not meet state or federal statutory requirements. Bluntly stated, Memorial Hospital has callously and negligently allowed a situation to develop in which all emergency obstetric and gynecological services to indigent patients—an enormous and ever-increasing load—have been left to on-call private physicians like Dr. Thompson, and the dumping of pregnant women has been the inevitable result.

Plaintiff's counsel introduced testimony from Vera Brown, Lacreta Mergerson, Wanda Saxton, and Werdner Simmons which indicated a long-standing pattern of dumping from 1984 on; that testimony was essentially unrefuted by Memorial Hospi-

tal. The rebuttal testimony of Elaine Salisbury, who first became aware of this civil action during the course of its trial, indicated that this practice continued through 1989. There was no serious contest as to the credibility of these witnesses, and their statements are accepted as true. It is found, as a fact, that for at least five years, Memorial Hospital has flagrantly been engaged in patient dumping.

The evidence given by plaintiff's expert Dr. F. Barry Roberts, who practiced for nine and one-half years at Memorial Hospital, that Memorial has been continuously obstructionist whenever physicians attempted to bring the problem of indigent health care to the attention of the Board, is also found credible. Deposition of Dr. F. Barry Roberts, pp. 12–17, 24, 25, 27, 29–30, 47. The weight of the evidence—especially considering the fact that when this civil action came on for trial, a private practitioner was the only OB–GYN delivering poor babies at Memorial—convincingly establishes a disturbing pattern of negligent behavior on the part of the administrators of Memorial Hospital which has inevitably led to the pattern of patient dumping. Deposition of Dr. F. Barry Roberts, p. 27; Cross–Examination of Ronnie Horn.

In the light of this pattern of either negligent or deliberate flouting by Memorial Hospital of its obligations under the Antidumping Act, plaintiff Rebecca Owens has amply demonstrated that she has standing, and that there is a real threat of injury to her. The complained of acts are capable of repetition, and indeed have been repeated. Plaintiff is awarded permanent injunctive relief to prevent these egregious acts from evading review in the future.

### VI. Conclusion

The purpose of the Anti–Dumping Act is to end the national scandal, as Senator Durenberger described it, of "rejecting indigent patients in life threatening situations for economic reasons alone," 131 Cong.Rec. at 513903 (daily ed. October 23, 1985), *cited in Stewart v. Myrick*, 731 F.Supp. 433 (Kansas 1990); *see also Bryant v. Riddle Memorial Hospital*, 689 F.Supp. 490 (E.D.Pa.1988).

By terms of the Antidumping Act, hospitals with emergency facilities cannot deny those facilities to the poor. They cannot shrug their shoulders and send children in rickety cars on four-hour drives, simply because they do not make the same money for treating such children as they do for paying customers. They may not wantonly turn their backs on the indigent.

### FINAL JUDGMENT

In accordance with the findings of fact and conclusions of law set forth in the memorandum opinion filed contemporaneously herewith, it is hereby

. ORDERED, ADJUDGED and DECREED that plaintiff Rebecca Owens shall be, and she is hereby, AWARDED judgment against defendant the Nacogdoches County Hospital District, for the sum of $25,000.00 in damages and $25,000.00 in attorneys' fees; it is further

ORDERED, ADJUDGED and. DECREED that defendants, Nacogdoches County Hospital District d/b/a Memorial Hospital, Paul Bostick, and Donnie Chumley and their successors in office in their official capacities, shall be, and they are hereby, PERMANENTLY ENJOINED from refusing plaintiff Rebecca Owens delivery in any future pregnancy in violation of 42 U.S.C. § 1395dd, for so long as she remains indigent.