Margaret **BORGREN**, Plaintiff,

v.

The **UNITED STATES of America**, Defendant.

Civ. A. No. 87–2191–S.

United States District Court, D. Kansas.

June 30, 1989.

Jerry R. Palmer, Palmer, Marquardt & Snyder, P.A., Topeka, Kan., for plaintiff.

Benjamin L. Burgess, Jr., U.S. Atty., Richard L. Hathaway, David M. Cooper, Connie R. DeArmond, Asst. U.S. Attys., Topeka, Kan., for defendant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This case was tried to the court on April 11 and 12, 1989. Plaintiff brought this medical malpractice action under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 through 2680. Her claim is based on the "loss of chance of survival" theory adopted by the Kansas Supreme Court in *Roberson v. Counselman*, 235 Kan 1006, 686 P.2d 149 (1984). After reviewing the evidence heard at trial and the submissions of the parties, the court is prepared to rule. Pursuant to Rules 52 and 58 of the Federal Rules of Civil Procedure, the court makes the following findings of fact and conclusions of law.

### I. *Findings of Fact*

A. *Plaintiff's Background and Medical History*

1. Plaintiff Margaret Borgren was born May 8, 1928. She is a white female, married, with eight living children, ages approximately 36, 35, 34, 33, 31, 25, 21 and 16. She has a history of diabetes and cigarette smoking.

2. Her husband, Calvin Borgren, is a retired captain in the United States Air Force.

3. Mrs. Borgren has a Masters degree as a reading specialist. Since 1975, she has taught Reading and English at Hayden High School in Topeka, Kansas. She taught a full load through the 1986–87 school year. The school district then cut her back to part time and she has since

worked in a supplementary capacity in the school library.

4. In June 1980, plaintiff reported to her family physician, Dr. Robert Jacoby, for her annual physical examination. Dr. Jacoby recommended at that time that she have a mammogram. As was her practice when she needed routine tests and other medical services, Mrs. Borgren went to Irwin Army Hospital at nearby Fort Riley, Kansas for the mammogram. Dr. Kotecha, a doctor at Irwin Army Hospital, reviewed the mammograms and found no definite primary or secondary signs of malignancy in either breast. However, he did note a "slight asymmetry" and recommended a follow-up examination in six months.

5. Mrs. Borgren did not obtain another mammogram within six months. Her next mammogram was in June 1983, again after her regular annual physical examination. Dr. Jacoby once again recommended she have a mammogram and again she went to Irwin Army Hospital for that procedure. At the hospital, Dr. James A. Webb, examined her by palpation and found an area of vague induration or thickening without a distinct mass in the upper quadrant of the left breast. He noted this finding on the mammogram request form. The radiologist examining the mammogram, Dr. Bock, reported a benign calcification of the left breast. He made no comment on the induration found by Dr. Webb and stated that there was no change from the 1980 report.

6. In June 1985, Mrs. Borgren again went to Dr. Jacoby for her yearly checkup. Dr. Jacoby detected no abnormalities when he examined her by palpation, but he again recommended a mammogram. She went to Irwin Army Hospital and the radiologist there, Dr. Victor Toro, reported that the mammogram showed no abnormalities and no change from the 1983 report.

7. In June 1986, Mrs. Borgren again went to Dr. Jacoby for her annual physical examination and he reported her palpation examination as normal. He referred her to Fort Riley for a mammogram. However, before the date of that mammogram, Mrs. Borgren performed a self-examination and found a lump in her left breast. She immediately called Dr. Jacoby, who referred her to Stormont–Vail Regional Medical Center in Topeka, Kansas for a mammogram.

8. The radiologist at Stormont–Vail, Dr. John Gay, reported a large area of architectural distortion of her left breast in the upper outer quadrant. He believed this distortion represented a possible carcinoma. He reviewed the 1980, 1983 and 1985 mammograms and determined that the 1983 and 1985 mammograms showed evidence of the same distortion.

9. On July 10, 1986, Dr. Charles Graham, a Topeka surgeon, performed a modified radical left mastectomy on Mrs. Borgren. He found a tumor measuring $3.5 \times 2.5 \times 1.7$ cm. It was classified as a Stage II (infiltrating ductal and lobular) carcinoma. All three levels of her axillary lymph nodes on the left side were affected and pathology reported that sixteen of her twenty-six lymph node samples tested positive for regional metastatic carcinoma. A bone scan indicated a shadow on the left side of the sixth thoracic vertebrae. That spot has remained unchanged through subsequent bone scans.

10. After an uneventful recovery from surgery and post-operative discomfort that "wasn't too bad", Mrs. Borgren began hormonal therapy by taking Tamoxifen. This therapy was recommended by her oncologist, Dr. Stanley Vogel, because of the high positive status in both her P.R. and E.R. receptors.

B. *Prognosis*

11. The prognosis for survival after a person has been diagnosed as having breast cancer is measured in terms of "disease free survival" for a length of time. "Disease free survival" means that the patient is alive and that there is no clinical evidence of a tumor's spread or recurrence.

12. The most prognostic indicator for disease free survival is nodal status. Nodal status means the number of lymph nodes which tested positive for regional metastatic carcinoma at the time of the diagnosis of the breast cancer.

13. A study by the National Surgical Adjuvant Breast Project ("NSABP") correlates nodal status with disease free survival. The study showed that a breast cancer patient who had no positive lymph nodes at the time of diagnosis has an eighty percent chance of surviving disease free for ten years; a patient with one to three positive nodes has a fifty-three percent chance of surviving disease free for ten years; a patient who has thirteen or more positive nodes has a thirteen percent chance of surviving disease free for ten years. These figures do not reflect the effect of Tamoxifen therapy. The beneficial effect of Tamoxifen therapy is uncertain.

14. The American Cancer Society, the National Cancer Institute, the American College of Surgeons, and the American College of Radiology agree that annual mammograms for women over the age of forty can lead to longer term survival and lower death rates for breast cancer.

## C. Cancer Growth and Detection

15. Malignant tumors such as plaintiff's grow exponentially; in other words, a single cancer cell divides into two cells, two cells divide into four, four cells divide into eight and so forth. The period of time required for a given number of cancer cells to double in number is called the "doubling time" of the tumor. The number of doublings and the size of a tumor are correlated as follows.

| Number of Doublings | Tumor Diameter |
| --- | --- |
| 0 | 1 cell |
| 13 | .5 mm |
| 20 | 1 mm |
| 30 | 1 cm |
| 35 | 3 cm |

16. Expert estimates of the doubling time for plaintiff's tumor ranged from 80 days to 210 days.

## II. Conclusions of Law

1. The court has subject matter jurisdiction over this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Personal jurisdiction and venue are proper.

2. In a Federal Tort Claims Act case, the United States "shall be liable ... in the same manner and to the same extent as a private individual in underlying circumstances." 28 U.S.C. § 2674. The United States is liable for the negligent acts of its agents. The substantive law of the state where the cause of action arose governs a Federal Tort Claims Act case. *Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). Kansas law governs this matter.

3. In a medical malpractice action, the plaintiff is required to prove three elements by a preponderance of the evidence: (1) the physician was negligent in treating the plaintiff; (2) the physician's negligence caused harm to the plaintiff; and (3) plaintiff suffered damages. *Cleveland v. Wong*, 237 Kan. 410, 416, 701 P.2d 1301, 1398 (1985).

4. The element of negligence is shown by demonstrating that defendant violated a duty of care. A physician has a duty to "use reasonable and ordinary care and diligence in the treatment of cases he undertakes, to use his best judgment, and to exercise that reasonable degree of learning, skill and experience which is ordinarily possessed by other physicians." *Durflinger v. Artiles*, 234 Kan. 484, 489, 673 P.2d 86, 92 (1983).

5. In a medical malpractice case, "expert medical testimony is ordinarily required to establish negligence or lack of reasonable care on the part of a physician or surgeon in his medical diagnosis, his performance of surgical procedures and his care and treatment of patients." *Webb v. Lungstrum*, 223 Kan. 487, 490, 575 P.2d 22, 25 (1978).

6. Causation is the second element of a medical malpractice claim. In a loss of chance of survival case, the finder of fact must determine whether "the evidence has established the patient had an appreciable chance to survive if given proper treatment." *Roberson*, 235 Kan. at 1020, 686 P.2d at 159. The finder of fact should examine "both the patient's chances of survival if properly treated and the extent to which the patient's chances of survival have been reduced by the claimed negligence." *Id.*

7. Defendant admits that its radiologists deviated from the accepted standard of care in examining the 1985 mammogram. The court further finds that the United States radiologists at Irwin Army Hospital deviated from the accepted standard of care in examining the 1983 mammogram, by failing to diagnose the likelihood of cancer in Mrs. Borgren's left breast, and by further failing to recommend a biopsy. Thus, within reasonable medical probability, Mrs. Borgren's condition of breast cancer existed in 1983 and in 1985 and went undiagnosed until July of 1986.

8. The court finds that there is a causal relationship between the negligence of the doctors at Irwin Army Hospital and the three year delay in treatment (by mastectomy and Tamoxifen therapy) experienced by Mrs. Borgren.

9. The court agrees with plaintiff's expert, Dr. Rossman, that plaintiff probably had 1 to 3 cancerous lymph nodes at the time of her mammogram in 1983. Defendant's experts testified that many more nodes were involved in 1983. However, even if the estimate of 1 to 3 cancerous lymph nodes is low, the number of nodes involved in 1983 were, to a reasonable medical certainty, significantly less than the number found in 1986. The evidence regarding estimates of the tumor's size in 1983 was inconclusive.

10. Because of the three year delay in diagnosis, the number of cancerous nodes increased significantly from 1983 to 1986. Accordingly, plaintiff's chances for disease free survival have decreased significantly, as shown by the NSABP study. The court bases its finding, in large part, on the the testimony of plaintiff's expert, Dr. Rossman. The court found Dr. Rossman more credible than defendant's expert, Dr. Fisher.

11. The court also rejects defendant's expert's "lead time bias" theory. That theory contends that a breast cancer patient will die at the same time, regardless of the time the cancer is diagnosed and treated. This is because the lead time bias theory holds that metastasis into the lymph nodes and other parts of the body occurs when the tumor is as small as .5 mm, long before it can be reliably detected by mammogram. This theory is in direct opposition to the mainstream of thinking in the medical community at this point. The American Cancer Society, the National Cancer Institute, the American College of Surgeons and the American College of Radiology each hold the view that early detection of cancerous tumors by mammogram can significantly increase a patient's chance of surviving disease free.

12. As a result of the delay in diagnosis, plaintiff has suffered a loss of chance of survival of between 30% to 57% for ten year survival.

13. The court further finds that Mrs. Borgren was also negligent, and her negligence in part led to a delay in the diagnosis of her cancer. The radiologist at Irwin Army Hospital in 1980 told her to follow up her 1980 mammogram in six months. She failed to do so. There was some evidence presented at trial which indicated there may have been some cancer present as early as 1980. Had Mrs. Borgren followed the radiologist's advice and followed up with another mammogram in six months, her cancer may have been detected at that time. However, the court also finds that this negligence was minimal, especially in light of her understanding from speaking with Dr. Jacoby that there was no urgent need for the follow up mammogram. Further, her failure to have the follow up mammogram is minor in comparison to the extreme deviation from the standard of care shown by the radiologists at Irwin Army Hospital in 1983 and 1985 in failing to detect the abnormalities in Mrs. Borgren's mammogram. The court will assess comparative fault against Mrs. Borgren of 10% and this will not bar her from recovering from the government.

14. The court further finds no comparative fault on the part of Mrs. Borgren's family physician, Dr. Jacoby. Defendant contended that Dr. Jacoby was negligent in allegedly recommending against the six month follow up mammogram in 1980.

However, the evidence presented at trial on this issue was inconclusive. Mrs. Borgren seems to remember that Dr. Jacoby told her it was not important to have the six month follow up mammogram. However, Dr. Jacoby does not remember making such a recommendation, and there is no written document or other evidence which would show he made such a recommendation. Without more, the court finds that the evidence is insufficient to show that Dr. Jacoby made such a recommendation. Thus, the court finds no comparative negligence on his part.

15. Plaintiff failed to show at trial that she incurred any medical expenses she would not have otherwise incurred had her breast cancer been diagnosed in 1983 or 1985. Thus, the court concludes that Mrs. Borgren suffered no additional medical expenses as a result of the failure to properly diagnose her.

16. Plaintiff's evidence at trial regarding her cutback at Hayden High School failed to establish by a preponderance of the evidence that the cutback had been caused by plaintiff's cancer. She was cut back to one-half time in the next contract offered after her mastectomy. However, there was no direct or circumstantial evidence showing that the school had decided to cut back her hours because of her medical condition. Thus, plaintiff is not entitled to recover lost wages.

■ 17. The court finds that plaintiff did establish by a preponderance of the evidence that her husband, Calvin Borgren, has lost the services of plaintiff and other elements of consortium. Although the evidence at trial indicated that the relationship between plaintiff and her husband had sometimes been strained, but that the two had grown closer in the face of the adversity brought on by Mrs. Borgren's cancer, the evidence also showed that Mrs. Borgren has suffered increased emotional trauma because of the delay in diagnosing her cancer and her resulting concern that her chance of survival has been decreased dramatically. As a result, Mrs. Borgren has suffered concentration problems, substantial decrease in interest and ability to do household chores, and frequent emotional breakdowns. The court finds that plaintiff's husband has lost the services of plaintiff and other elements of consortium having a reasonable value of Two Hundred Thousand Dollars ($200,000.00).

■ 18. Plaintiff also claims damages for disfigurement; because there was a delay of approximately three years in diagnosing the cancer, Mrs. Borgren allegedly lost the chance for a lumpectomy or other less radical procedures than the modified radical mastectomy performed in 1986. She also claims disability, including depression brought on by her belief that her chances of survival have decreased. This depression has manifested itself in a decreased interest in household chores, increased concentration problems, and decreased ability to manage her diabetes. Finally, plaintiff claims damages for pain and suffering and mental anguish brought on by the knowledge that her chances of disease free survival have decreased, and damages for the loss of chance of survival itself.

The court finds by a preponderance of the evidence that the three year delay in diagnosis did result in a loss of a chance to be treated with a lumpectomy or other less disfiguring procedure than the modified radical mastectomy performed, and that she did as a result suffer disfigurement. Further, the court finds by a preponderance of the evidence that Mrs. Borgren has suffered disability along with pain, suffering and mental anguish as a result of her knowledge and belief that she has a decreased chance of disease free survival. Finally, the court finds that the evidence established by a preponderance of the evidence that plaintiff has lost an appreciable chance to survive. Based on the statistics presented at trial, the plaintiff lost, within a reasonable medical probability, a 30% to 57% chance for ten year disease free survival. Plaintiff was 58 years of age in 1983 (when the cancer should have first been diagnosed) with a probable normal life expectancy of 24.3 years.

19. The court has examined the evidence regarding the plaintiff's loss of

chance of survival. It has also taken into consideration plaintiff's age and the health risks associated with her diabetes and her long history of cigarette smoking, and has further examined the information submitted by plaintiff's counsel on judgments in comparable cases. The court has determined that it should award $200,000.00 on plaintiff's loss of consortium claim. On plaintiff's claim for disfigurement disability, pain, suffering and mental anguish and loss of chance of survival, the court has determined that plaintiff should recover damages of $800,000.00. The total amount of damages should be reduced by plaintiff's comparative negligence of 10%. Thus, plaintiff's recovery will be reduced by 10%, or $100,000.00, and judgment will be entered in her favor in the amount of $900,-000.00.

IT IS BY THE COURT THEREFORE ORDERED that judgment be entered in favor of the plaintiff in the amount of $900,000.00.