**Julie DELANEY, Plaintiff,**

v.

**Victor R. CADE, D.O.; St. Joseph Memorial Hospital; and Central Kansas Medical Center, Defendants.**

No. 88–1657–C.

United States District Court,
D. Kansas.

Jan. 25, 1991.

the defendants' alleged violation of 42 U.S.C. § 1395dd. This matter comes before the court upon defendant Victor R. Cade's motion for summary judgment (Dk. 159) and upon defendants St. Joseph Memorial Hospital and Central Kansas Medical Center's motion for summary judgment (Dk. 161).[1] The two motions for summary judgment present several of the same issues of law. The court, having considered the briefs of the parties and the applicable law, is now prepared to rule upon the motions.

Facts

Many of the facts are undisputed. The parties stipulate that the law of Kansas and the United States govern this action. On November 22, 1986, at approximately 9 a.m., Delaney's car collided with an automobile operated by William Lange.[2] The parties stipulate that Lange's negligence was the sole cause of the automobile accident. Delaney's personal injuries suffered at the time of the automobile accident included a transected aorta, lacerated knees, bi-lateral carpel tunnel, three fractures in the right arm, a broken nose, lacerations on the face, a broken tooth, lacerations in the mouth and fractures in the neck.

Delaney was transported to St. Joseph Memorial Hospital, Larned, Pawnee County, Kansas. Upon her arrival at 10:30 a.m. at St. Joseph, Delaney was treated by Victor Cade, D.O. Dr. Cade was a member of St. Joseph's staff and was the physician on call on November 22, 1986. After treatment by Dr. Cade, Delaney was transferred in the early afternoon of November 22, 1986, to the Central Kansas Medical Center in Great Bend, Kansas. Physicians in Great Bend provided medical care and treatment to the plaintiff. Later that same day, Delaney was transferred by helicopter to the K.U. Medical Center in Kansas City, Kansas.

Dwight A. Corrin, Corrin & Krysl, Wichita, Kan., for plaintiff.

William Tinker, Jr., McDonald, Tinker, Skaer, Quinn & Herrington, Harry M. Bleeker, Turner & Boisseau, Wichita, Kan., for defendants.

**MEMORANDUM ORDER**

CROW, District Judge.

Julie Delaney brings this diversity of citizenship action to recover damages for the alleged negligent medical treatment of the defendants following an automobile accident on a county road in Pawnee County, Kansas. Delaney also claims damages for

---

1. In the pretrial order the parties stipulate that St. Joseph is a proper party to this suit and it and/or Central Kansas Medical Center will not dispute responsibility to pay a judgment if one is entered against St. Joseph. The parties further stipulated that Central Kansas Medical Center will be dismissed. For simplicity, the court will refer to the arguments of the two hospitals as St. Joseph.

2. On February 26, 1990, Delaney accepted William Lange's offer of judgment of $100,000.

An aortagram was performed at the K.U. Medical Center. The aortagram showed a transected aorta and that the aorta had thrombosed[3] at the site of transection. Dr. Moran of the K.U. Medical Center performed an operation to repair the transected aorta. As a result of the thrombosis of the aorta, Delaney suffers the permanent condition of being a paraplegic from T–8 down. It is not known why Delaney's aorta thrombosed. Apparently thrombosis of the aorta is a very rare occurrence. Between thirty and sixty factors predispose an individual to clotting.

### Standards for Summary Judgment

Summary judgment is appropriate when the movant can demonstrate that there is no genuine issue of material fact and is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Fed.R.Civ.P. 56(c).

Delaney's claim of negligence against the defendants rests in part upon the defendants' alleged delay in transporting her to a medical facility equipped to treat her injuries. Specifically, Delaney contends that Dr. Cade did not administer adequate or necessary treatment upon her admittance to St. Joseph. Delaney contends that the three and one-half hour delay (between the time she was admitted to St. Joseph and the time she was admitted to the K.U. Medical Center) deprived her of a significant chance to have a better recovery from her permanent injuries. Delaney contends that this delay, in part, was caused by Dr. Cade's alleged unfamiliarity with St. Joseph's protocols. Delaney also contends that the delay has also complicated her recovery, making it longer and more difficult than it would otherwise have been. Delaney concedes, however, that her paraplegia may even have occurred with care that was not negligent.

Dr. Cade contends that Delaney has failed to meet her burden of proving that his alleged negligence was the cause in fact of her injuries. Dr. Cade contends that the absence of expert medical testimony on the issue of causation entitles him to summary judgment on the issue of negligence. Dr. Cade also contends that Delaney's claim for "loss of chance" is inappropriate as a matter of law. Dr. Cade contends that the "loss of chance" theory only applies in death cases.

St. Joseph basically advances the same arguments as Dr. Cade. St. Joseph contends that Delaney has failed to demonstrate by expert testimony that any negligent action on its part caused or contributed to her injuries. In addition to the arguments advanced by Dr. Cade, St. Joseph specifically denies Delaney's claims as set forth in the pretrial order. St. Joseph challenges whether it had a duty to establish and inform the staff of rules or protocols regarding treatment of trauma patients, transfer of patients, and whether it had a duty to see whether Delaney was transferred to a facility that could adequately treat her injuries (given that Delaney was transferred based upon Dr. Cade's diagnosis).

"Negligence is an essential element of a medical malpractice action." *Durflinger v. Artiles*, 234 Kan. 484, Syl. ¶ 2, 673 P.2d 86 (1983). In a medical malpractice action, the plaintiff is required to prove three elements by a preponderance of the evidence: (1) the physician was negligent in treating the plaintiff; (2) the physician's negligence caused harm to the plaintiff; and (3) the plaintiff suffered damages. *Cleveland v. Wong*, 237 Kan. 410, 416, 701 P.2d 1301 (1985). "A physician is obligated to his patient to use reasonable and ordinary care and diligence in the treatment of cases he undertakes, to use his best judgment, and to exercise that reasonable degree of learning, skill and experience which is ordinarily possessed by other physicians in the same or similar locations." *Durflinger*, 234

---

**3.** Thrombosed means affected by thrombosis. Thrombosis means the presence of a thrombus. Thrombus means an aggregation of blood factors, primarily platelets and fibrin with entrapment of cellular elements, frequently causing vascular obstruction at the point of its formation. Some authorities thus differentiate thrombus formation from simple coagulation or clot formation. *Dorland's Illustrated Medical Dictionary* 1365 (26th Edition, 1981).

Kan. 484, Syl. ¶ 3, 673 P.2d 86. "[I]n medical malpractice actions, the physician or surgeon is presumed to have carefully and skillfully treated or operated on his patient, and that there is no presumption of negligence from the fact of an injury or adverse result." *Leiker v. Gafford,* 245 Kan. 325, 349, 778 P.2d 823 (1989).

In a medical malpractice case, "expert medical testimony is ordinarily required to establish negligence or lack of reasonable care on the part of a physician or surgeon in his medical diagnosis, his performance of surgical procedures and his care and treatment of patients." *Webb v. Lungstrum,* 223 Kan. 487, 490, 575 P.2d 22 (1978). *See Crooks v. Greene,* 12 Kan.App.2d 62, 65, 736 P.2d 78 (1987) (expert testimony is ordinarily required in medical malpractice cases to establish the standard of care and to prove causation).

In Kansas it is a fundamental rule that actionable negligence must be based on a breach of duty. *Durflinger,* 234 Kan. at 488, 673 P.2d 86. Whether a duty exists is a question of law. *Id.* Whether a duty has been breached is a question of fact. *Id.* "Hospitals owe a duty to their patients to exercise reasonable care. This is such care, skill and diligence as the known physical and mental condition of the patient may require, and it is that degree of care used by other hospitals in the community or similar communities under like circumstances." *Malone v. University of Kansas Medical Center,* 220 Kan. 371, 375, 552 P.2d 885 (1976).

St. Joseph's duty to Delaney.

St. Joseph dedicates approximately five and one-half pages of analysis to the issue of whether or not it owed a duty to Delaney, and if it owed a duty, whether it breached such a duty. In response, Delaney dedicates approximately one paragraph to these same issues. In pertinent part, her response states: "The hospital knew or should have known that Dr. Cade was not aware of the [hospital's] rules and was not following them. It must be held accountable for that sloppy oversight as well."

■ Delaney's discussion of these issues is wholly inadequate. First, Delaney does not establish that St. Joseph owed her any of the duties she alleges it breached. While a hospital, of course, owes a duty of reasonable care to all of its patients, the record does not establish the appropriate standard of care St. Joseph's was required to provide Delaney. Necessarily, therefore, none of the testimony demonstrates that St. Joseph deviated from the acceptable standard of care. Even if St. Joseph owed any of the duties claimed by Delaney, none of the expert testimony establishes to a reasonable degree of medical certainty that the breach of any duty caused Delaney's injuries.

Delaney admits to the following statements of uncontroverted facts:

5. Based upon probabilities of reasonable medical certainty, Dr. Harrison cannot testify that the transfer from St. Joseph Memorial Hospital to the Central Kansas Medical Center in any way caused or contributed to the plaintiff's permanent disability or impairment.

6. The nurses did not deviate from the accepted standard of medical care by not starting an intravenous injection on the plaintiff.

7. The treating physician was responsible for deciding to institute an intravenous injection.

8. The nursing staff is obligated to follow the doctor's orders regarding the institution of an intravenous injections.

9. Dr. Cade considered and rejected the institution of an intravenous injection.

10. The presence of a protocol or the lack of a protocol in the instant case is irrelevant to the causation of the plaintiff's permanent injuries.

11. It is not a breach of the standard of care for the hospital when a physician fails to follow a hospital protocol in a particular case.

These admissions demonstrate that St. Joseph did not breach any relevant standard of care in this case. Even assuming that St. Joseph was under a duty to promulgate protocols involving the treatment and transfer of trauma patients, Delaney admits that the hospital does not breach the

standard of care when a physician fails to follow its protocols.

■ As to the issue of whether or not St. Joseph was negligent in failing to see that Delaney was transferred to a facility which could adequately treat her problems, apparently the ultimate decision of whether or not to transfer a patient rests in the discretion of the treating physician. In this case, the decision to transfer Delaney was Dr. Cade's. St. Joseph contends that the failure to transfer Delaney was based solely upon the alleged misdiagnosis of Dr. Cade, and that it was under no duty to see that Delaney was transferred to a more appropriate facility. Delaney has identified no authority, either case law or expert testimony, to demonstrate that in this case St. Joseph owed and breached a duty to her as a patient in its facility. The record does not indicate the standard of care owed by St. Joseph to its patients and whether St. Joseph deviated from that standard. Rather, the record indicates that any delays were caused by Dr. Cade and not St. Joseph.

In addition, none of Delaney's experts could state to a reasonable degree of medical certainty that any delays in transferring Delaney caused by the hospital caused her paraplegia or caused her other injuries. In fact, the evidence indicates that her condition was stabilized before she was transferred to Great Bend. Dr. Caliendo, one of the plaintiff's experts, stated that transferring Delaney from St. Joseph to Central Kansas Medical Center did not deviate from accepted standards of practice. The court is not satisfied that Dr. Harrison's opinions on this issue were expressed to a reasonable degree of medical certainty.

St. Joseph's motion for summary judgment on the issue of negligence causing paraplegia and Delaney's other injuries is granted.

### Negligence and "Loss of Chance"

Delaney's experts are generally critical of Dr. Cade's treatment of Delaney upon her arrival at St. Joseph's. Dr. Cade's failure to conduct a full physical examination, to begin an IV [4] and his delay in transporting her to superior facilities may be examples from which a reasonable jury could conclude that his treatment of Delaney deviated from acceptable standard of care. While Delaney's experts are critical of Dr. Cade's performance, their testimony on the issue of causation, i.e. "Was Dr. Cade's deviation from the accepted standard of care the cause in fact of any of Delaney's current injuries?," is decidedly less clear. The parties have basically divided their discussion of Delaney's claims into two categories: claims for paraplegia and claims for other injuries. The court will address each of these claims.

Delaney's claim for loss of chance of recovery from paraplegia.

None of Delaney's experts are able to say within a reasonable degree of medical certainty that Dr. Cade's treatment (or delay in proper treatment) caused Delaney's paraplegia. Dr. Moran's deposition indicates that greater proximity or faster transportation to K.U. Medical Center would not have prevented Delaney's paraplegia. Dr. Harrison's deposition states that there is a ninety-five percent chance that the care Delaney received at St. Joseph had no effect on her current condition.

Dr. Harrison's deposition constitutes the foundation of Delaney's claim for loss of chance of recovery. Dr. Harrison could not state to a reasonable degree of medical certainty that Delaney's paraplegia was a direct result of the care and treatment she received at St. Joseph. Dr. Harrison stated that Delaney "could be paraplegic regardless of the care she received prior to surgery." Dr. Harrison also indicated that it was his medical opinion that it was more likely than not that Delaney's paraplegia was due to the automobile accident. However, Dr. Harrison did state that ten percent of the patients experiencing the type of injury sustained by Delaney will suffer paraplegia regardless of the treatment administered. (Therefore if Delaney was an

---

**4.** Dr. Cade apparently made the conscious decision not to start an intravenous injection for fear of raising the plaintiff's blood pressure.

individual in that ten percent portion of the population, the alleged negligence of the defendants did not cause her injury.) If, however, Delaney was in the other ninety percent of those who would not have suffered paraplegia, then the alleged negligence of the defendants could have caused her paraplegia. There is no way to tell whether Delaney was in the 10% or 90% portion of the population. Dr. Harrison believed that the care Delaney received at St. Joseph increased the risk of paraplegia by five percent.

Delaney contends that she is entitled to recover for her "loss of chance" of recovery under *Roberson v. Counselman*, 235 Kan. 1006, 686 P.2d 149 (1984). The defendants, in a spartan discussion of the issue, contend that *Roberson* only applies in death cases.

In *Roberson*, Mr. Roberson, complaining of "pain in the left shoulder area and left side causing hard breathing and chest ache", visited his chiropractor. The chiropractor, who knew of Mr. Roberson's previous heart condition, performed two chiropractic adjustments, but did not advise Mr. Roberson to consult a medical physician. A few hours later, Mr. Roberson died of a heart attack in his own home.

Mr. Roberson's wife brought a malpractice action against the chiropractor, alleging that his negligence substantially reduced Mr. Roberson's chance of surviving the fatal heart attack. Roberson retained three experts. One expert's testimony indicated that the chiropractor had a duty to refer Roberson to a medical specialist and that the failure to do so constituted a breach of that duty. A cardiologist testified that with in-hospital treatment for his heart attack, Mr. Roberson had a nineteen percent chance of dying. Without such treatment the mortality rate is twenty-five percent. Therefore the absence of proper medical treatment cost Mr. Roberson a six percent chance of survival. Another cardiologist stated that with proper medical treatment Mr. Roberson had a forty percent chance of survival and that without such treatment his chance of survival was zero percent.

The district court granted summary judgment in favor of the defendant because the plaintiff lacked "a better than even chance of surviving the heart attack." 235 Kan. at 1013, 686 P.2d 149. The Supreme Court of Kansas reversed. After reviewing cases from other jurisdictions, the court concluded:

> The question of causation in cases involving negligent treatment of a potentially *fatal condition* (including failure to refer the patient to an appropriate specialist) is generally a matter to be determined by the finder of fact where the evidence has established the patient had an *appreciable chance to survive* if given proper treatment. In making the determination, the finder of fact should take into account both the patient's *chances of survival* if properly treated and the extent to which the patient's *chances of survival* have been reduced by the claimed negligence. (emphasis added)

235 Kan. at 1020, 686 P.2d 149.

The court also explained its rationale:

> There are sound reasons of public policy involved in reaching this result. The reasoning of the district court herein (which is similar to the extreme position taken in *Cooper v. Sisters*, 27 Ohio St.2d 242 [272 N.E.2d 97 (1971)]), in essence, declares open season on critically ill or injured persons as care providers would be free of liability for even the grossest malpractice if the patient had only a fifty-fifty chance of *surviving* the disease or injury even with proper treatment. Under such rationale a segment of society often least able to exercise independent judgment would be at the mercy of those professionals on whom it must rely for *life-saving* health care. (emphasis added)

235 Kan. at 1021, 686 P.2d 149.

Since *Roberson*, neither the Supreme Court of Kansas nor the Kansas Court of Appeals has discussed the "loss of chance" theory. This court is troubled by the implications of *Roberson* in all medical malpractice cases. There are at least three possible interpretations of *Roberson*. One possible interpretation is that the Kansas Su-

preme Court, by watering-down the threshold necessary to survive summary judgment on the issue of causation in medical malpractice cases, inadvertently lifted the lid on pandora's box. It appears to this court that under this interpretation of *Roberson* the plaintiff in any medical malpractice case who couched his or her complaint in terms of "loss of chance" would be virtually immune from summary judgment on the issue of causation. By producing some evidence that the care rendered by a physician (or for that matter any member of the hospital staff) deprived the plaintiff an "appreciable chance" of a more favorable recovery, the plaintiff would effectively avoid summary judgment on the issue of causation. The court does not consider the Kansas Court to reach this conclusion.

As a second interpretation, as the plaintiff suggests, *Roberson* could be interpreted as a recognition of "loss of chance" as a compensable injury in any medical malpractice case, rather than a blurring or distortion of the issue of causation. Professor King, in the seminal article articulating the loss of chance theory, comments:

> The response of the courts to questions of causation and valuation involving preexisting conditions and claims for future consequences has largely been unsatisfactory. Their failure to distinguish between the functions of causation and valuation, or to identify and value rationally the true interests lost, has created a serious gap in the remedial structure. Courts have had difficulty perceiving that a chance of avoiding some adverse result or achieving some favorable result is a compensable interest in its own right. In some respects the notion of chance has been subsumed into the final result. When this occurs, the loss of a chance of avoiding some adverse result or achieving some favorable result either is completely redressed or is denied, depending on the likelihood, destroyed by the defendant's tortious conduct, of avoiding or achieving the particular result.
>
> It is the thesis of this article that the loss of a chance of achieving a favorable outcome or of avoiding an adverse conse-

quence should be compensable and should be valued appropriately, rather than treated an all-or-nothing proposition. Preexisting conditions must, of course, be taken into account in valuing the interest destroyed. When those preexisting conditions have not absolutely preordained an adverse outcome, however, the chance of avoiding it should be appropriately compensated even if that chance is not better than even.

J. King, *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences,* 90 Yale L.J. 1353, 1354 (1981).

*Roberson* could be viewed as recognizing loss of chance as a compensable injury in all medical malpractice cases. Evaluating a plaintiff's claim for loss of chance would hypothetically involve two distinct inquiries: (1) Did the defendant's negligence cause an appreciable loss of chance of a better outcome? (causation); and (2) What is the nature and extent of that loss? (valuation of the loss). The determination and valuation of the loss of chance would generally be matters for the finder fact. The finder of fact, considering the plaintiff's preexisting condition and the probability that the defendant's negligent treatment deprived the plaintiff of an appreciable chance of survival or recovery, would determine the amount of damages that would compensate the plaintiff for the loss of the chance of recovery. Professor King' article discusses this theory of recovery in great detail.

The third alternative, and the interpretation this court chooses to follow, is to limit the "loss of chance" theory to cases involving loss of chance of survival. *See Fennell v. Southern Maryland Hospital Center, Inc.,* 320 Md. 776, 580 A.2d 206, 214 (1990) (court comments that loss of chance theory only applies in survival actions); *but see Jones v. Montefiore Hospital,* 494 Pa. 410, 431 A.2d 920 (1981) (cited by the court in *Roberson* ); *Thompson v. Sun City Community Hospital, Inc.,* 141 Ariz. 597, 688 P.2d 605 (1984) (Arizona recognizes loss of chance theory; patient seeking to recover

for malpractice causing impairment of left leg); *Ehlinger v. Sipes*, 155 Wis.2d 1, 454 N.W.2d 754 (1990) (plaintiff seeking to recover for loss of chance her twins could have been healthier); *Herskovits v. Group Health Cooperative of Puget Sound*, 99 Wash.2d 609, 664 P.2d 474 (1983) ("It is not necessary for a plaintiff to introduce evidence to establish that the negligence resulted in the injury or the death, but simply that the negligence increased the risk of injury or death."); *see generally James v. United States*, 483 F.Supp. 581, 587 (N.D. Cal.1980) ("[n]o matter how small that chance may have been—and its magnitude cannot be ascertained—no one can say that the chance of prolonging one's life or decreasing suffering is valueless.").

Three Kansas federal district courts have considered the *Roberson* loss of chance theory. *See Boody v. United States*, 706 F.Supp. 1458 (D.Kan.1989) (Judge Theis; decedent's loss of 51% chance of surviving five years compensable); *Denton v. United States of America*, 1990 WL 98335, 1990 U.S.Dist.Lexis 8727 (D.Kan.1990) (Judge Van Bebber; decedent's loss of 80% chance to survive compensable). In *Borgren v. United States*, 716 F.Supp. 1378 (D.Kan. 1989), Judge Saffels applied the loss of chance theory of *Roberson* to a case in which the plaintiff and her husband sought damages resulting from doctors' negligent medical treatment. The negligence of the doctors at Irwin Army Hospital resulted in a three year delay in treatment of the plaintiff's breast cancer. A modified radical mastectomy was required. Due to the doctor's negligence, the plaintiff lost, within a reasonable medical probability, a 30% to 57% chance for ten year disease free survival. Judgment was entered in favor of the plaintiff (who apparently was still alive). However, in that case the plaintiff specifically sought to recover for "loss of chance of survival."

■ There are at least three reasons supporting the court's conclusion that the "loss of chance" theory should be limited to survival actions. First, *Roberson* factually involved loss of chance of survival. The court specifically refers to recovery for loss of chance of survival. In discussing its rationale for adopting the loss of chance theory, the court was concerned that failure to recognize the loss of chance theory in cases involving a less than fifty-fifty chance of recovery would declare open season on the critically ill. Because death is the greatest loss, and in reality an injury not recoverable (particularly from the decedent's standpoint), Kansas recognized loss of chance of survival as a compensable injury. In short, *Roberson* recognized that a physician cannot simply ignore a critically injured person simply because that person had a less than fifty percent chance of surviving.

Second, applying the loss of chance theory in all medical malpractice cases undermines the fifty-percent rule found in K.S.A. 1989 Supp. 60–258a. For example, assume that the plaintiff was more than 50% negligent in causing the automobile accident resulting in her injuries. Under Kansas' comparative fault statute, she should not be allowed to recover against any of the defendants. If, however, the plaintiff is allowed to sue for a loss of chance of a more favorable recovery, notwithstanding her comparative fault, the fifty-one percent rule is thwarted. The plaintiff should not be allowed to divvy up her cause of action so as to avoid the legislature's construction of comparative fault. *See McReynolds v. Bigler*, No. 88–1343–C, slip op., 1990 WL 171064 (D.Kan.1990).

Third, in cases involving multiple defendants the jury will be left to divine the proper allocation of causation and damages. As Professor King notes, the courts have historically had difficulty in separating the issues of causation and the valuation of damages.[5] From the jury's perspective, the issues of causation and damages

---

5. "It is not uncommon for courts to apply the concept of causation to matters of valuation as well as causation. This melding of concepts is more than a matter of style or nomenclature; it has often affected the ways courts deal with preexisting conditions and future consequences." King, *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 Yale at 1355.

would often seem inextricably intertwined. The jury, faced with a quagmire of evidence relating to multiple defendants, comparative fault, loss of chance and the damages, would be required to ultimately place a dollar amount upon the plaintiff's loss of chance. While it is possible that the jury, properly instructed, could discern the distinctions between causation and valuation and arrive at a just result, the jury will more likely be left in a morass of confusion. The jury will in all likelihood be reduced to applying pure percentages to total damages, rather than compensating the plaintiff for the loss of chance of a more favorable recovery. The court does not believe that the Supreme Court of Kansas intended such a result in all medical malpractice cases.

In sum the court is convinced that the Kansas loss of chance theory should be limited to survival actions. The court does not believe that *Roberson* was intended to dramatically change the long established requirement in all medical malpractice cases that the plaintiff demonstrate that the physician's deviation from the minimally accepted standards of the medical profession was more likely than not a substantial factor in causing the plaintiff's injuries. Without clearer indication from the Supreme Court of Kansas, this court is unwilling to extend *Roberson* and the loss of chance theory beyond survival actions.

■ In any event, even if Kansas did recognize "loss of chance of a more favorable recovery" in *Roberson*, Delaney would be unable to survive summary judgment on the issue of whether the defendants deprived her of an "appreciable chance" of survival. Unfortunately, the Supreme Court of Kansas did not provide any guidance by defining the meaning of an "appreciable chance", nor did the court's discussion of cases from other jurisdictions provide meaningful analysis of the loss of chance theory. "Appreciable" means capable of being estimated, weighed judged of, or recognized by the mind. Appreciable

also means perceptible, but it is not a synonym of substantial. *Black's Law Dictionary* 130 (4th ed. 1968); *see Noland v. Wootan*, 102 Ariz. 192, 427 P.2d 143 (1967). Under *Roberson*, there is no requirement that the loss of chance must be greater than fifty percent; a forty percent chance of survival was an appreciable chance entitling the plaintiff to avoid summary judgment. *See generally Fennell v. Southern Maryland Hospital Center, Inc.*, 320 Md. 776, 580 A.2d 206 (1990) (Maryland considers and rejects loss of chance theory; case collects and discusses cases from other jurisdictions considering or adopting loss of chance theory.).

This begs the question: How large must a "chance" be to be an "appreciable chance"? Ten percent? Five percent? It is conceivable that a one percent chance of survival or recovery would be "appreciable." Yet, the word appreciable must mean something beyond "any" chance. Most of the courts recognizing the "loss of chance" theory require the loss of chance to be "substantial.[6]" *See Herskovits*, 664 P.2d 474. In the three Kansas federal district court cases cited above, the plaintiff's "loss of chance" involved significantly greater deprivations than Delaney's five percent loss of chance. The court concludes that even if Kansas would recognize loss of chance of a more favorable recovery in all medical malpractice cases, the defendants in this case have not deprived Delaney of an "appreciable chance" of survival within the meaning of *Roberson*. *See Waffen v. U.S. Dept. of Health & Human Services*, 799 F.2d 911, 922 (4th Cir.1986) (rejecting *de minimis* standard). If the court were to recognize such a small loss of chance as an "appreciable chance," virtually *any* medical decision which resulted in a less-than-ideal outcome would be subject to second-guessing and tort liability. The threat of such liability would have far-reaching effect.

Dr. Cade's motion for summary judgment on the issue of loss of chance for a better recovery from paraplegia is granted.

**6.** In fact, Kansas appears to be the only jurisdiction requiring an "appreciable chance" as op-

posed to a "substantial chance."

Delaney's other injuries.

■ Delaney claims that the failure to administer appropriate emergency treatment, particularly the failure to give her an IV, deviated from accepted medical standards and the delay in administering proper treatment caused kidney damage and otherwise prolonged her recovery period. Dr. Cade basically responds that no evidence based upon reasonable medical certainties demonstrates a causal link between their alleged negligence and those injuries.

The court is satisfied that there is evidence to support the Delaney's contention that Dr. Cade's treatment was a substantial factor in causing her other injuries and caused the need for a longer recovery. *See* Dr. Harrison's deposition, at 7–8; Dr. Francisco's deposition, Exhibit # 1. Dr. Cade's motion for summary judgment on this issue is denied.

### 42 U.S.C. § 1395dd

■ The defendants contend that, as a matter of law, Delaney cannot bring a cause of action under 42 U.S.C. § 1395dd. The defendants contend that 42 U.S.C. § 1395dd was enacted solely to prevent the "dumping" of indigent patients at other medical facilities. Delaney contends that the statute is not limited to "dumping" situations and that the statute creates a cause of action against both the physician and the hospital for violations of the statute's provisions. Delaney contends that Dr. Cade and St. Joseph violated § 1395dd by transferring her from St. Joseph hospital to the Central Kansas Medical Center, which did not have "qualified personnel for the treatment of the individual" as required by § 1395dd(c)(2)(A)(i).

Section 1395dd was enacted as part of the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA). The legislative history of section 1395dd indicates that the statute was enacted as a response to the nationwide problem of "dumping" indi-

gent patients who have no health insurance at other medical treatment facilities. *See* H.R. No. 99–241, 99th Cong.2d Sess. 27, reprinted in 1986 U.S.Code Cong. & Admin. News 579, 605–606. *See also Owens v. Nacogdoches County Hosp. Dist.,* 741 F.Supp. 1269 (E.D.Tex.1990).[7]

The defendants contend that Judge Kelly's decision in *Stewart v. Myrick,* 731 F.Supp. 433 (D.Kan.1990) is dispositive of Delaney's claim. In *Stewart,* the court held that 42 U.S.C. § 1395dd does not cover a situation that "does not represent a case of patient dumping, in which the plaintiff was turned away from medical care for economic reasons." 731 F.Supp. at 436. In the case at bar, Delaney does not contend that she was transferred to Central Kansas Medical Center for economic reasons.

Since *Stewart,* other courts have considered the issue of whether or not a claim may be asserted under § 1395dd where the patient does not allege that denial of treatment was based on inability to pay. In *DeBerry v. Sherman Hop. Ass'n,* 741 F.Supp. 1302 (N.D.Ill.1990), the court, after considering *Stewart,* concluded that a patient could assert a claim under § 1395dd notwithstanding the fact that the patient did not allege that they were denied treatment for economic reasons. The court acknowledged that the legislative history of the act makes it clear that the statute was primarily concerned with preventing the dumping of indigent patients. The court concluded, however, that the "language of the statute quite plainly goes further" and did not limit the application of the statute to "dumping" situations. 741 F.Supp. at 1306.

In *Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d 266 (6th Cir.1990), the sixth circuit considered whether a patient bringing a claim under § 1395dd was required to allege that he was denied treatment for economic reasons. The court, af-

---

**7.** The only Tenth Circuit Court of Appeals' case discussing 42 U.S.C. § 1395dd is *Stevison v. Enid Health Systems, Inc.,* 920 F.2d 710 (10th Cir.1990). In that case, the plaintiff, who was indigent and did not have insurance, was allegedly refused medical attention because she could not pay for the treatment. The only issue on appeal was whether the district court had erred in submitting an instruction which improperly shifted the burden of proof under 42 U.S.C. § 1395dd.

ter considering *Stewart* and *DeBerry*, chose to follow the analysis of *DeBerry*. The court commented:

> The words of the statute on basic eligibility are quite plain, and interpreting them as such does not lead to an absurd result. It leads to a result considerably broader than one might think Congress should have intended, or perhaps than any or all individual members of Congress were cognizant of. However, it is not our place to rewrite statutes to conform with out notions of efficacy or rationality. That is the job of Congress. It is only where the language that Congress uses admits of varying interpretations that secondary means of interpretation come into play. Here, the result we reach in no way vitiates or is contrary to Congress's indicated concern in passing the legislation. It may go further than what Congress contemplated, but that is not a reason to distort or exercise the words that Congress wrote.

917 F.2d at 270. This court finds this analysis persuasive.

■ While the court concludes that claims under § 1395dd are not limited to denials of treatment based on inability to pay, Delaney's cannot assert a claim under § 1395dd as the facts do not indicate that the defendants violated the statute. St. Joseph contends that Dr. Cade and St. Joseph's personnel stabilized Delaney's condition prior to transporting her to Central Kansas Medical Center. Dr. Cade's deposition indicates that Delaney was stabilized prior to being transported to Great Bend. St. Joseph contends that even Delaney's experts acknowledge that her condition did not deteriorate as a result of her transfer to Great Bend.

In her discussion of this argument, Delaney basically concedes that she was stabilized before being transferred. She does, however, argue:

> This ignores the nature of the violation in this case. 1395(c)(1)(B) requires that the transfer be 'an appropriate transfer

(within the meaning of paragraph (2)).' Paragraph (2)(B)(i) states that the receiving facility must 'have qualified personnel for the treatment of the individual.' Delaney's contention is based upon a misreading of § 1395dd. Section 1395dd(c) provides in pertinent part[8]:

> Rule. If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(4)(B)), the hospital may not transfer the individual unless—
>
> . . . . .
>
> (B) the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

Section (e)(4)(B) provides in pertinent part:

> The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility . . .

Therefore, in order to reach § 1395dd(c)(1)(B) (pertaining to an "appropriate transfer") the plaintiff must demonstrate that his or her condition was not "stabilized" prior to being transferred. If the patient's condition is "stabilized" then no violation of § 1395dd occurs as a result of releasing the patient or transferring the patient to another facility. *See DeBerry*, 741 F.Supp. at 1305. In this case, Delaney was apparently "stabilized" prior to being transferred. Any subsequent transfer, even to a treatment facility without qualified personnel, is not proscribed by § 1395dd.

The court also notes that 42 U.S.C. § 1395dd does not provide a private cause of action against an individual physician. Section 1395dd(d)(3)(A) provides:

> Personal harm. Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil

---

**8.** In 1989 section 1395dd was amended. These amendments do not change the substantive analysis of this statute.

action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

The statute's remedy section clearly creates a private cause of action against the hospital [9], but fails to provide an individual with a civil remedy against the individual physician. If Congress had intended to create a private cause of action against the physician, it knew how to do so. At least one other court has reached this same conclusion. *See Lavignette v. West Jefferson Medical Center*, 1990 WL 178708, 1990 U.S.Dist.Lexis 14966 (E.D.Louisiana 1990); *but see Sorrells v. Babcock*, 733 F.Supp. 1189 (N.D.Ill.1990).

Dr. Cade and St. Joseph are entitled to summary judgment on Delaney's claim for violation of § 1395dd.

IT IS THEREFORE ORDERED that Dr. Cade's motion for summary judgment (Dk. 159) is granted in part and denied in part.

IT IS FURTHER ORDERED that St. Joseph's motion for summary judgment (Dk. 161) is granted.

---

**9.** *See Bryant v. Riddle Memorial Hospital,* 689    F.Supp. 490 (E.D.Penn.1988).