Joyce STEWART, Individually, as an Heir, and On Behalf of All Heirs of George E. Stewart, Deceased; and Joyce Stewart, Administrator of the Estate of George E. Stewart, Deceased, Plaintiff,

v.

Mickey MYRICK, M.D.; and Hadley Regional Medical Center, Defendants.

No. 88–1658–K.

United States District Court, D. Kansas.

Feb. 23, 1990.

David P. Calvert, Focht, Hughey, Hund & Calvert, Wichita, Kan., for plaintiff.

William Tinker, Jr., McDonald, Tinker, Skaer, Quinn & Herrington, and Brian Wright, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

The present case is a wrongful death action brought by plaintiff Joyce Stewart, the widow and administrator of the estate of George E. Stewart. The defendants are Hadley Regional Medical Center of Hays, Kansas, and Dr. Mickey Myrick.

Defendant Hadley has moved for summary judgment against the plaintiff's claim made under 42 U.S.C. § 1395dd. A hearing on the matter was held on February 13, 1990, at which time the court announced its findings. Consistent with the statements of the court at that time, and for the reasons discussed herein, the defendant's motion is granted.

Summary judgment is proper, where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the non-moving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judg-

ment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R. Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

On December 2, 1986, George Stewart went to the emergency room at Hadley Medical Center. At the hospital, Stewart saw Dr. Myrick, a physician with admitting privileges at Hadley. The parties do not agree on the nature of Stewart's complaints. The plaintiff and Hadley Hospital contend that Stewart complained to Dr. Myrick of severe chest pain, loss of color, and shortness of breath. Dr. Myrick contends that these complaints were made neither to him nor to his nurse. The plaintiff also makes the factual assertion that Stewart was experiencing a medical emergency on December 2. The parties agree that Stewart was instructed to return to the hospital for tests on December 3.

Stewart returned to the hospital on December 4. An upper gastrointestinal test series had been scheduled, but Dr. Myrick was unable to obtain conclusive test results because Stewart had eaten prior to the tests. The plaintiff contends that Stewart was in a condition of medical emergency on December 4.

Stewart left the hospital. He telephoned Dr. Myrick's office twice on December 8. Otherwise, he did not seek further medical attention until December 12. On that date, Stewart suffered extreme chest pain, which caused him to vomit and collapse. Stewart died shortly after his arrival by ambulance at the hospital.

In the present motion for summary judgment by Hadley, and the plaintiff's re-

sponse, both parties rely on opinions stated by the opposing party's expert witnesses. Hadley stresses that in its deposition of the plaintiff's two experts, Drs. Timothy Scanlon and James Davia, neither attributed any fault in the death of George Stewart to Hadley. Davia stated in his deposition that Hadley was not at fault in any way.

The plaintiff stresses that her witnesses were deposed prior to the deposition of Dr. Myrick, and as a result, they were not presented with the information obtained from Dr. Myrick. Dr. Myrick testified at his deposition that he had not read the nurses' notes prepared at the hospital on December 2, since they were filled out after he and Stewart had left the hospital. The notes indicate that Stewart's pain was easily provoked by any activity, that he had cut down on his smoking, that he had to take deep breaths to control the pain, and that 35 minutes prior to the examination he had taken an Isordil tablet to alleviate the pain. The plaintiff cites the testimony of Hadley's expert, Dr. Gregory Boxberger, who testified that this information suggests coronary atherosclerotic heart disease with unstable angina pectoris, an emergency medical condition. Dr. Boxberger testified that the patient's health would be in serious jeopardy, and that Stewart should have been admitted to the hospital.

It is uncontroverted that George Stewart was never denied treatment or discharged from Hadley due to a lack of insurance.

The plaintiff asserts a claim for relief against the hospital under the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("the Act"). The plaintiff alleges that the defendants violated the requirement of appropriate screening of subsection (a), and the transfer and screening requirements of paragraph (b)(1). 42 U.S.C. § 1395dd(a) provides:

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment of a medical condition, the hospital must provide for an appropriate medical screening exami-

nation within the capability of the hospital's emergency department to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists or to determine if the individual is in active labor (within the meaning of subsection (e)(2) of this section).

42 U.S.C. § 1395dd(b)(1) provides:

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition or is in active labor, the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition or to provide for treatment of the labor, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

The Act was signed into law on April 7, 1986 as an addition to the Consolidated Omnibus Budget Reconciliation Act (COBRA), P.L. 99–272. The Act was passed in order to help prevent the growing problem of "patient dumping." Note, *Preventing Patient Dumping: Sharpening the COBRA's Fangs*, 61 N.Y.U.L.Rev. 1186 (1986). Legislators speaking on the subject stressed that the purpose of the measures was to ensure that indigent persons were not denied emergency health care due to their financial status. Thus, Representative Bilirakis, speaking on a similar bill he introduced in the House Energy and Commerce Health Subcommittee, stated that "no person should be denied emergency health care or hospital admittance because of a lack of money or insurance." 131 Cong.Rec. H9503 (daily ed. October 31, 1985). Senator Durenberger, speaking on the Senate version of the House bill which ultimately became the Act, stated that the bill was intended to eliminate the "unconscionable" practice among some hospitals of "rejecting indigent patients in life threatening situations for economic reasons alone." 131 Cong.Rec. at § 13903 (daily ed. October 23, 1985). Senator Durenberger continued:

All Americans, rich or poor, deserve access to quality health care. This question of access should be the Government's responsibility at the Federal, State, and local levels. We cannot and should not expect hospitals to be this Nation's national health service.

At the same time while we in the Congress and the State legislatures are groping for areas to get quality health care to the uninsured Americans, we cannot stand idly by and watch those Americans who lack the resources be shunted away from immediate and appropriate emergency care whenever and wherever it is needed.

*Id.*

The House Ways and Means Committee spoke to the same concern in its report on the House bill which was the basis for the Act, H.R. 3128, Section 124.

The Committee is greatly concerned about the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance....

There is some belief that this situation has worsened since the prospective payment system for hospitals became effective. The Committee wants to provide a strong assurance that pressures for greater hospital efficiency are not to be construed as license to ignore traditional responsibilities and loosen historic standards.

H.R.Rep. No. 241(1), 99th Cong., 1st Sess. 27, *reprinted in* 1986 U.S.Code Cong. & Admin.News 579, 605. Analyzing this legislative history in *Bryant v. Riddle Memorial Hosp.*, 689 F.Supp. 490, 493 (E.D.Pa. 1988), the court concluded that "the overall purpose of the Act [is to establish] a series of federal guidelines which medicare hospitals having emergency medical care facilities must follow to prevent the problem of patient dumping."

Indigent persons denied emergency medical care possess a private federal cause of action under the Act. *Bryant*, 689 F.Supp. at 493. However, the present federal claim against the defendant hospital must be dis-

missed. Taking as true the facts alleged by the plaintiff, the case represents a traditional claim for medical malpractice. It does not represent a case of patient dumping, in which the plaintiff was turned away from medical care for economic reasons. As a result, the case does not present the type of evil that Congress sought to eliminate in the Act, and the federal claim will be dismissed. The Act expressly provides that there is no preemption of state and local law except when there is a direct conflict with the terms of the federal law. 42 U.S.C. § 1395dd(f). The case therefore falls within the ambit of state negligence law, not the federal anti-dumping law.

One recent case, uncited by any of the parties, supports this conclusion. In *Evitt v. University Heights Hosp.*, 727 F.Supp. 495 (S.D.Ind.1989), decided December 27 of last year, the plaintiff brought an action under 42 U.S.C. § 1395dd. The plaintiff claimed the defendant hospital had violated the Act when it treated and released her without performing a full EKG, and therefore had failed to provide the "appropriate medical screening" required by § 1395dd(a).

The court rejected the plaintiff's claim, finding that it did not present a matter actionable under the Act. The court found that there was no evidence that the plaintiff had been turned away from the defendant's emergency room for economic reasons. After discussing the legislative history of the Act, the court stated:

The plaintiff's interpretation reaches beyond the purpose of the statute, which is specifically directed toward preventing prospective patients from being turned away for economic reasons.

Underlying plaintiff's reading of the screening provision is her implicit complaint that she was misdiagnosed. Following her reasoning, if [her physician] had suspected she was having a heart attack, he would have ordered a 12–lead EKG, which would have confirmed his suspicions and led to the plaintiff's admission and further treatment. This complaint, rather than focusing on the "dumping" problem, begins by attacking the doctor's provisional diagnosis. Claims regarding diagnosis and treat-

ment lie in the area of medical malpractice, an area traditionally regulated by state law. To adjudicate these issues under the anti-dumping provision would lead to federal preemption not contemplated under this Act.

727 F.Supp. at 497 (citation omitted).

Moreover, the court found that to accept the plaintiff's interpretation of the Act would be to make the hospital the guarantor of emergency room diagnosis and treatment. The Act was not intended to create such an obligation. Instead, the plaintiff's claim of misdiagnosis stated "a mere malpractice claim which should be resolved in state court." *Id.* at 498.

IT IS ACCORDINGLY ORDERED this 23rd day of February, 1990, that defendant Hadley's motion for summary judgment is hereby granted.