**Jerry COLEMAN, individually and as husband and next of kin to Terrie Ann Coleman, deceased, Plaintiff,**

v.

**McCURTAIN MEMORIAL MEDICAL MANAGEMENT, INC., also known as McCurtain County Trust Authority, Inc., also known as the McCurtain County Hospital Authority d/b/a McCurtain Memorial Hospital, Defendant.**

No. 90–589–S.

United States District Court,
E.D. Oklahoma.

June 17, 1991.

Willard L. Driesel, Idabel, Okl., for plaintiff.

A. Scott Johnson, Mary Hanan and Laurie Fong, Oklahoma City, Okl., for defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

SEAY, Chief Judge.

The instant case is a wrongful death action brought by plaintiff Jerry Coleman, individually and as husband and next of kin to Terrie Ann Coleman (Coleman), against defendant McCurtain Memorial Hospital (Hospital). Plaintiff asserts two claims for relief: 1) violation of the provisions of the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd (the Act), and 2) medical malpractice. Defendant's motion for summary judgment and supplemental motion for summary judgment are before the court for resolution. Defendant has moved for judgment in its favor as to both claims asserted by plaintiff. For the reasons stated below, the court finds that summary judgment in favor of defendant is appropriate on plaintiff's claim under the Act and inappropriate on plaintiff's claim of medical malpractice.

### BACKGROUND

The facts necessary for the resolution of these motions are not in dispute. On March 13, 1989, Coleman presented herself at the emergency room of the Hospital requesting an examination and/or treatment for a medical condition. Coleman was complaining of chest and abdominal pains and an inability to keep fluids and solids down for three days. Dr. David McElroy (McElroy), an emergency room physician at the Hospital, examined Coleman and ordered lab tests and chest x-rays. Prior to appearing at the emergency room on March 13, 1989, Coleman had never been examined or treated by McElroy.

McElroy diagnosed Coleman as having viral gastroenteritis. Also, the tests revealed signs of an enlarged heart and tach-

ycardia. McElroy prescribed medication to treat the symptoms of the viral gastroenteritis and help Coleman keep the fluids down. While McElroy offered Coleman the option of hospitalization for the virus, McElroy believed Coleman's condition did not warrant hospitalization and that the virus was running its course. Concerning the condition of Coleman's heart, McElroy's diagnosis was that Coleman had a potentially serious problem but that there were no signs of acute failure to warrant additional tests or hospitalization. McElroy did, however, inform Coleman of his belief that a cardiac consultation with a cardiologist was warranted and past due. Coleman was thereafter discharged from the emergency room on March 13, 1989. McElroy's report notes that Coleman was stable upon her discharge.

After some slight improvement, Coleman's condition took a turn for the worse. On March 15, 1989, Coleman again presented herself to the Hospital's emergency room with complaints of breathing pains, numbness, cramps, and cold extremities. Her condition deteriorated to the point where she developed severe cyanosis and became unconscious and hypotensive. She was treated and cared for while in the emergency room by Hospital physicians and was thereafter admitted and placed in the Hospital's intensive care unit.[1] Her condition was diagnosed as respiratory failure and some type of heart failure. On March 16, 1989, Coleman was transferred by airlift to Texarkana Hospital where she was placed in the intensive care unit and treated for the heart condition. Tragically, Coleman died on March 17, 1989, of cardiogenic shock.

## SUMMARY JUDGMENT STANDARD

Having moved for summary judgment in its favor, defendant is required to show the absence of a genuine issue of material fact. Fed.R.Civ.P. 56(c). The initial burden is to show the absence of evidence to support

plaintiff's case. *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Defendant must identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which establish the absence of any genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2553. Defendant need not negate plaintiff's claim or disprove plaintiff's evidence, but rather, defendant's burden is to show that there is no evidence in the record to support plaintiff's claim. Plaintiff, as the nonmoving party, must go beyond the pleadings and by way of affidavits or "depositions, answers to interrogatories, and admissions on file" designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

■ Summary judgment is not appropriate if there exists a genuine material factual issue such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–51, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986). In this regard, all evidence of the nonmoving party is deemed true and all reasonable inferences are drawn in favor of the nonmoving party. This court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511. With these standards in mind, the court turns to the merits of defendant's motions.

## EMERGENCY MEDICAL TREATMENT AND ACTIVE LABOR ACT CLAIM

As part of the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA), Congress enacted the Emergency Medical Treatment and Active Labor Act (Act), 42 U.S.C. § 1395dd et seq. to address and alleviate the problem of "patient dumping" practiced by hospitals throughout the country. Essentially, "patient dumping" is

---

1. Plaintiff contends this treatment and Coleman's subsequent admission were delayed due to an argument between plaintiff and hospital personnel concerning the couple's ability to pay for any expenses incurred. For the reasons set

forth hereafter, this assertion, even if true, in no way compromises defendant's entitlement to summary judgment on plaintiff's claim under the Act.

the practice of transferring patients to another facility or refusing to treat patients who are indigent or have no health insurance. Under the Act, hospitals receiving Medicare funds and maintaining an emergency room are obligated to follow certain procedures when patients present themselves at the emergency room.

██ Under the Act, hospitals "must provide an appropriate medical screening examination within the capability of the hospital's emergency department to determine whether or not an emergency medical condition ... exists."[2] 42 U.S.C. § 1395dd(a). If the hospital determines that an emergency medical condition exists, section 1395dd(b)(1) of the Act requires it to either stabilize the patient or transfer the patient in accordance with other provisions of the Act.[3] Thus, a plain reading of the Act dictates that the provisions concerning stabilization and transfer are implicated only after the hospital determines that an emergency medical condition exists. *See Delaney v. Cade*, 756 F.Supp. 1476, 1486 (D.Kan.1991) (provisions of the Act pertaining to the appropriate transfer are implicated only if the patient's condition was not stabilized prior to being transferred). If the hospital reasonably concludes that no emergency medical condition exists, it can release or transfer a patient without implicating the provisions of the Act. Likewise, courts have recognized a corollary to this proposition by refusing to sanction actions brought under the Act based on misdiagnosis or inadequate treatment. *Evitt v. University Heights Hosp.*, 727 F.Supp. 495, 497 (S.D.Ind.1989); *Stewart v. Myrick*, 731 F.Supp. 433, 436 (D.Kan.1990). These types of actions do not address the "evil that Congress sought to eliminate in the Act" and they fall "within the ambit of state negligence law, not the federal anti-dumping law." *Stewart*, 731 F.Supp. at 436.[4]

██ Defendant relies upon the rationale of both *Stewart* and *Evitt* in seeking to have the court enter summary judgment in its favor as to plaintiff's claim under the Act. Defendant asserts that this case is clearly the type of "misdiagnosis" action precluded under the provisions of the Act and the holdings of *Stewart* and *Evitt*. Plaintiff, however, argues that the facts herein are distinguishable from those in *Stewart* and *Evitt*. In this regard, plaintiff argues that this is not a "misdiagnosis" case, but rather, a claim based on the hospital's failure and refusal to stabilize and treat Coleman for her heart condition after a diagnosis that she had a serious condition in that respect.[5] Despite plaintiff's skillful characterization of the facts, the court is not persuaded by plaintiff's reasoning and finds that this is a classic case of allegations of "misdiagnosis" and failure to treat. Thus, the Act is not implicated and the holdings of *Stewart* and *Evitt* are persuasive authority for the entry of summary

**2.** In relevant part, section 1395dd(e)(1) defines "emergency medical condition" as:

"(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
(i) placing the health of the individual ... in serious jeopardy,
(ii) serious impairment to bodily functions, or
(iii) serious dysfunction of any bodily organ or part;"

Although not applicable herein, the court notes that the definition of "emergency medical condition" also covers women who are in labor.

**3.** Section 1395dd(b)(1) provides:

"If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—
(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
(B) for transfer of the individual to another facility in accordance with subsection (c) of this section."

**4.** In this regard, the Act expressly provides that "[t]he provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f).

**5.** Outside of the allegations concerning delay in providing treatment on March 15, 1989, plaintiff apparently has limited his claim under the Act to the occurrences of March 13, 1989.

judgment in favor of defendant on plaintiff's claim under the Act.

Despite plaintiff's attempt to argue otherwise, the record conclusively establishes that the hospital, through McElroy, did not determine that an emergency medical condition existed when Coleman presented herself at the hospital's emergency room on March 13, 1989. McElroy's deposition testimony reveals that while the tests and his examination of Coleman uncovered an enlarged heart and a rapid heart rate, Coleman's medical history, her symptoms, and her responses to McElroy's questioning did not indicate an acute problem which can be considered an emergency medical condition.[6] McElroy's diagnosis in this respect was entirely reasonable given the circumstances. Coleman was examined, treated, and given medication for the suspected virus. She was instructed to return if her condition worsened. It was McElroy's considered medical opinion that there was not an acute problem with Coleman's heart. Undoubtedly, as noted by McElroy, Coleman exhibited signs of a potentially serious heart condition, but not one which required emergency medical care. A cardiac consultation was recommended. McElroy's assessment that a cardiac consultation was warranted and overdue, as opposed to further testing and emergency medical care, is the prototypical diagnosis which does not expose the hospital to liability under the Act. *Stewart*, 731 F.Supp. at 436; *Evitt*, 727 F.Supp. at 497–98.

Notwithstanding plaintiff's characterization of his claim, the court finds that the undisputed facts establish this case as one seeking redress under the Act based on a "misdiagnosis" and failure to treat. The Act, as federal law, does not preempt general medical malpractice law. 42 U.S.C. § 1395dd(f); *Evitt*, 727 F.Supp. at 497.

Plaintiff's allegations concerning "misdiagnosis" and failure to treat are properly contained within his claim for medical malpractice. As aptly noted by the court in *Evitt:*

> "Claims regarding diagnosis and treatment lie in the area of medical malpractice, an area traditionally regulated by state law. To adjudicate these issues under the anti-dumping provision would lead to federal preemption not contemplated under the Act.
>
> . . . .
>
> Taking the plaintiff's argument to its logical conclusion would lead to the result that any patient dissatisfied with an emergency room diagnosis and release could sue the hospital under the anti-dumping provision. This construction would, in effect, make the Hospital the guarantor of the physicians' diagnosis and treatment irrespective of how reasonable such diagnosis may have appeared at the time of the patient's release, and irrespective of whether the patient was released for lack of funds or similar ulterior motive, on the one hand, or whether she was released simply because the physician after a reasonable examination saw no reason to commit her to hospitalization. We do not believe that the federal statute goes so far."

*Evitt*, 727 F.Supp. at 497–98. Likewise, this court does not believe the Act is implicated herein where the allegations concern McElroy's diagnosis and treatment of Coleman when she presented herself at the hospital's emergency room on March 13, 1989.

■ Plaintiff also asserts a violation of the Act's 1989 amendment regarding delay in examining or treating a patient, 42 U.S.C. § 1395dd(h).[7] The effective date of

---

**6.** Plaintiff attempts to create a factual dispute with regard to Coleman's condition on March 13, 1989, by presenting the affidavit of Dr. William Anderson (Anderson). Anderson's affidavit is patently insufficient in that it merely recites conclusions with respect to Coleman's condition without any factual basis or foundation.

**7.** Section 1395dd(h) was added as an amendment to the Act in 1989 and provides:

> "A participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) of this section or further medical examination and treatment required under subsection (b) of this section in order to inquire about the individual's method of payment or insurance status."

the 1989 amendment was July 1, 1990.[8] Obviously, this provision regarding delay in examination and treatment was not in effect when Coleman presented herself at the hospital emergency room on March 15, 1989. Thus, to the extent plaintiff's claim under the Act is based upon section 1395dd(h) for a delay in examination or treatment on March 15, 1989, it too must fail.

## MEDICAL MALPRACTICE

■ With respect to plaintiff's medical malpractice claim, defendant contends it is entitled to summary judgment in its favor for the reason that under Oklahoma law it is not liable for the acts of independent contractors such as McElroy. Defendant contends that it is a political subdivision subject to the provisions of the Oklahoma Political Subdivision Tort Claims Act (Tort Claims Act), 51 O.S. § 151, et seq. The Tort Claims Act specifically exempts the State or a political subdivision from liability for acts or omissions of an independent contractor. 51 O.S. § 155, subd. 18. Because McElroy was an independent contractor and this medical malpractice action centers around allegations of McElroy's negligence, defendant argues it is exempt from liability under the provisions of the Tort Claims Act, 51 O.S. § 155, subd. 18.

Plaintiff counters defendant's independent contractor argument by asserting that plaintiff is estopped from denying liability for the alleged negligent acts of McElroy under the doctrine of ostensible agency as articulated by Oklahoma courts in *Smith v. St. Francis Hospital, Inc.*, 676 P.2d 279 (Okla.Ct.App.1983) and *Weldon v. Seminole Municipal Hospital*, 709 P.2d 1058 (Okla.1985). This court agrees with plaintiff. Whether the issue is framed in terms of the exception under 51 O.S. § 155, subd. 18 or general principles of respondeat superior, the doctrine of ostensible agency precludes defendant from claiming an exemption from liability for the acts of McElroy under the circumstances of this action.

Thus, the court concludes that defendant's motion for summary judgment with respect to the medical malpractice claim should be denied and, further, that defendant is estopped from denying liability for the acts of McElroy.

Both *Smith* and *Weldon* recognized the general rule that under the theory of respondeat superior a hospital is not vicariously liable for the negligent acts of a physician who is an independent contractor and not an employee of the hospital. *Smith*, 676 P.2d at 282; *Weldon*, 709 P.2d at 1059. This general rule, however, is not without exceptions. One exception is the doctrine of ostensible agency or agency by estoppel. Under this doctrine a hospital is estopped or prevented from denying responsibility for the alleged negligent acts of its agents. The relevant inquiry for the application of this doctrine is "whether the plaintiff, at the time of his admission to the hospital, was looking to the hospital for treatment of his physical ailments or merely viewed the hospital as the situs where his physician would treat him for his problems." *Weldon*, 709 P.2d at 1060 (citing *Smith* 676 P.2d at 282). The physician's status as an independent contractor, whether it be by virtue of a contract with the hospital or by an assessment of the control exercised by the hospital over the physician, is of little significance with regard to the resolution of the ostensible agency question. *Smith*, 676 P.2d at 282.

With the proper focus in mind, the court concludes that plaintiff is entitled to the benefit of the doctrine of ostensible agency. It is undisputed that Coleman had never been examined or treated by McElroy before presenting herself at the hospital's emergency room on March 13, 1989. McElroy was not Coleman's family physician and had no contact with Coleman or her family prior to March 13, 1989. When she appeared at the emergency room on March 13, 1989, Coleman was availing herself of whatever medical care she could

---

8. Section 6211(i) of Pub.L. 101–239 provides that the 1989 amendments, including section 1395dd(h), "shall take effect on the first day of the first month that begins more than 180 days after the date of the enactment of this Act [December 19, 1989], without regard to whether regulations to carry out such amendments have been promulgated by such date."

receive without regard to any individual physician. She was there to receive treatment from the hospital through the personnel provided by the hospital. Under these circumstances, it can be said that she reasonably relied upon the authority of McElroy to act on behalf of the hospital.

As noted in both *Smith* and *Weldon*, the critical factor in the evaluation of an ostensible agency proposal is the existence of a preexisting physician-patient relationship.[9] No such relationship existed in this case. Therefore, the court concludes that under the doctrine of ostensible agency defendant is estopped from denying responsibility for the alleged negligent acts of McElroy in diagnosing and treating Coleman. Consequently, defendant's motion for summary judgment with respect to the medical malpractice claim is denied.

### PUNITIVE DAMAGES

Finally, defendant claims that under the Tort Claims Act, 51 O.S. § 154B, punitive damages are not recoverable. Plaintiff's response fails to address this issue. Consequently, the court finds that plaintiff has admitted that the hospital is a public trust and, therefore, a political subdivision within the meaning of the Tort Claims Act. 51 O.S. § 152, subd. 8(d). Under section 154 subd. B, punitive damages are not recoverable against a political subdivision such as the hospital. Accordingly, the hospital's motion for summary judgment with respect to plaintiff's request for an award of punitive damages is granted.

### CONCLUSION

Based on the foregoing analysis, the court finds that there are no genuine issues of material fact concerning plaintiff's claim under the Act and defendant is entitled to judgment as a matter of law on such claim. Also, summary judgment in favor of defendant should be granted as to plaintiff's request for punitive damages. Finally, de-

fendant's motion with respect to plaintiff's medical malpractice claim is denied and defendant is estopped from denying responsibility for the alleged negligent acts of McElroy.

IT IS SO ORDERED.

9. Indeed, the courts' determinations as to the existence of a preexisting physician-patient relationship accounts for the different findings with respect to ostensible agency. In *Smith*, the court relied upon the absence of such relationship in holding that the hospital was estopped from denying responsibility for the alleged negligent acts of its agents. In *Weldon*, the court relied upon a preexisting physician-patient in holding that the hospital was not subject to liability where it was merely the place where the family physician would treat the plaintiff.