Derrick Lee URBAN, et al., Plaintiff,

v.

William T. KING, M.D., et al., Defendant.

Civ. A. No. 91–2317–GTV.

United States District Court,
D. Kansas.

Sept. 29, 1993.

Michael R. O'Neal, Gilliland & Hayes, P.A., Hutchinson, KS, for Jay S. Schukman, M.D.

Kenneth E. Peirce, Reynolds, Peirce, Forker, Suter & Rose, Hutchinson, KS, for Joseph Gateno, M.D.

Darrell D. Kellogg, Rand J. Trutt, Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, KS, for Carl W. Fieser, M.D., and Terrance J. Cavanaugh, M.D.

Steven C. Day, Woodard, Blaylock, Hernandez, Pilgreen & Roth, Wichita, KS, for Central Kansas Medical Center, Great Bend, Kan.

Marty T. Jackson, Speer, Austin, Holliday & Zimmerman, Olathe, KS, for The Fuller Brush Co.

## MEMORANDUM AND ORDER

VAN BEBBER, District Judge.

This is a personal injury action to recover monetary damages from defendant Central Kansas Medical Center ("CKMC") for its alleged violations of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, *et seq.*,[1] and from three co-defendant physicians for alleged malpractice. The claims arise from the care and treatment given to plaintiff Rosalind Urban during her pregnancy. Plaintiffs claim that the statutory violations and negligent obstetrical care are the proximate cause of the severe brain damage and profound mental retardation sustained by minor plaintiff Derrick Urban.

This case is now before the court on the Motion for Summary Judgment filed by defendant CKMC (Doc. 232). For the reasons set forth in this memorandum, the motion is granted. Since the court's jurisdiction over the state law claims against the codefendant physicians was based solely on supplemental jurisdiction, 28 U.S.C. § 1367, those claims are dismissed.

Michael S. Holland, Russell, KS, for plaintiffs.

Harry M. Bleeker, Watkins, Calcara, Rondeau & Friedman, P.A., Brian C. Wright, Turner & Boisseau, Chartered, Great Bend, KS, for William T. King, M.D.

1. Section 1395dd was enacted as part of the Consolidated Omnibus Budget Recommendation Act (COBRA) of 1986, and is sometimes referred to as a COBRA provision. Pub.L. No. 99–272, § 9121, 100 Stat. 82, 164–67 (1986).

## I. SUMMARY JUDGMENT STANDARDS

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses, and the court should interpret the rule in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Thus, the court's proper inquiry is "whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be discharged by "showing," that is, pointing out to the district court, that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554. Rule 56, however, imposes no requirement on the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323, 106 S.Ct. at 2553 (emphasis in original). Once the moving party has properly supported its motion for summary judgment, the burden of production shifts to the nonmoving party. "A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. Thus, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* The court reviews the evidence on summary judgment under the substantive law and based on the evidentiary burden that the parties will face at trial on the particular claim. *Id.* at 254, 106 S.Ct. at 2513.

## II. FACTUAL BACKGROUND

In accordance with D.Kan.Rule 206(c), the parties have set forth a number of uncontroverted facts. Those facts which are relevant to this memorandum and order are as follows:

This case arises out of Rosalind Urban's twin pregnancy in 1989. Mrs. Urban was treated during her pregnancy by William T. King, M.D. Dr. King practices at Great Bend, Kansas, and limits his practice to the field of obstetrics and gynecology.

Pursuant to Dr. King's direction, Mrs. Urban had a number of non-stress tests performed at CKMC during her pregnancy. According to Mrs. Urban, the non-stress tests were done under a schedule provided to her by Dr. King. She personally made the appointments by calling the obstetrics department at CKMC. The tests were conducted at the hospital's obstetrics department where Mrs. Urban would report. The tests were performed on an out-patient basis, and the hospital's only role was to perform the tests.

The events relating to the plaintiffs' cause of action against defendant CKMC began with a non-stress test which was performed on November 24, 1989. The staff nurse who conducted that test interpreted the results as non-reactive as to both twins, meaning that there was no fetal movement. The nurse worked with Mrs. Urban for an hour trying to get a positive result from this test. The nurse then called defendant Dr. Schukman at his residence (Dr. King was out of town) and reported the non-reactive non-stress test. She also reported to Dr. Schukman that fetal heart tones were in the 150's for both twins and that Mrs. Urban's vital signs were normal. Dr. Schukman ordered that Mrs. Urban return the next morning to have the non-stress test repeated. Mrs. Urban then left the hospital at approximately 8:00 p.m.

The nurse has testified by deposition that she was not alarmed by her inability to con-

firm fetal movement because of the range of the heart beats for both twins. She saw no evidence of fetal distress. Mrs. Urban testified that the nurse said nothing which led her to believe that there was anything unusual or abnormal about the non-stress test. Dr. Schukman testified that nothing the nurse told him led him to believe that there was a problem and that it was not unusual to order a non-stress test to be repeated in such a situation.

Mrs. Urban returned to the hospital on the morning of November 25, 1989, for the repeat test. The nurse who conducted that test became concerned when she could not get a clear tracing of one of the twins. She concluded that something was wrong and called defendant Dr. Gateno, an obstetrician and gynecologist who works in the Great Bend area. Dr. Gateno arrived at the hospital five minutes later and ordered a biophysical profile. The results showed an absence of fetal heart rate motion on one of the twins, no movement for either baby, only a small amount of amniotic fluid, and poor tone.

Dr. Gateno explained the situation to Mrs. Urban and gave her the choice of staying in CKMC and delivering by Caesarian section or going to Wesley Regional Medical Center in Wichita. He explained to her that a neonatologist would be available to care for the living twin in Wichita, and that the living twin would have a better chance in Wichita than at CKMC since CKMC is a limited hospital.

Mrs. Urban wanted to talk to her family before deciding whether to go to Wichita and finally decided to go to Wichita at 4:00 p.m. Dr. Gateno testified that he concurred in this decision because he believed it would be in the best interests of the infant. Mrs. Urban was taken to Wichita by ambulance, a two hour trip. She was not in labor prior to leaving CKMC and the ambulance trip was uneventful.

Mrs. Urban arrived at Wesley at 7:05 p.m. and the Cesarian section was performed at 9:41 p.m. The surviving twin, plaintiff Derrick Urban, suffers from serious and permanent central nervous system injury which has resulted in extensive physical and mental impairments.

## III. DISCUSSION

Congress enacted EMTALA to "address and alleviate the problem of 'patient dumping' practiced by hospitals throughout the country." *Coleman v. McCurtain Memorial Medical Management, Inc.,* 771 F.Supp. 343, 345 (E.D.Okla.1991). "Patient dumping" is the practice of transferring patients to another facility or refusing to treat patients who are indigent or have no health insurance. EMTALA imposes two requirements on hospitals receiving Medicare funds. First, when a person presents himself to a hospital emergency room, the hospital must provide for an appropriate medical screening examination. *Abercrombie v. Osteopathic Hosp. Founders Ass'n,* 950 F.2d 676, 680 (10th Cir.1991). Second, "if the patient has an emergency medical condition which has not been stabilized, the patient, subject to certain exceptions . . . may not be transferred out of the hospital." *Id.* (citing 42 U.S.C. § 1395dd(c)). In this case, the plaintiffs are not alleging any violation of the medical screening requirement. Only the second requirement is at issue.

The starting point of our analysis is the statutory language. · The EMTALA sections with which we are here concerned are 42 U.S.C. § 1395dd(b) and (c). The relevant portions of these sections, as in effect on November 24 and 25, 1989, read as follows:

§ 1395dd. **Examination and treatment for emergency medical conditions and women in active labor**

(b) **Necessary stabilizing treatment for emergency medical conditions and active labor**

(1) **In general**

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, or is in active labor, the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medi-

cal condition, or to provide for treatment of the labor, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section....

(c) **Restricting transfers until patient stabilized**

(1) **Rule**

If a patient at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(4)(B) of this section), the hospital may not transfer the patient unless—

(A)(i) the patient (or a legally responsible person acting on the patient's behalf) requests that the transfer be effected, or

(ii) a physician, ... or other qualified medical personnel when a physician is not readily available in the emergency department, has signed a certification that, based upon the reasonable risks and benefits to the patient, and based upon the information available at the time, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual's medical condition from effecting the transfer; and

(B) the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

The relevant definitions from the statute, as it read at that time, are as follows:

(e) **Definitions.** In this section:

(1) The term "emergency medical condition" means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(A) placing a patient's health in serious jeopardy,

(B) serious impairment to bodily functions, or

(C) serious dysfunction of any bodily organ or part....

(5) The term "transfer" means the movement (including the discharge) of a patient outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital ...

Plaintiffs argue that an emergency medical condition, as defined by the statute, existed on November 24, 1989, at the time of Mrs. Urban's non-stress test. They contend that the hospital violated section 1395dd(c) by releasing Mrs. Urban without first stabilizing the emergency condition. In support of this theory, and in rebuttal to the summary judgment motion, plaintiffs have offered evidence that the November 24 test results, in conjunction with the history of this pregnancy, should have led the medical personnel to a conclusion that a medical emergency existed.

Defendant CKMC responds that the plaintiffs have misinterpreted the statute, and that the issue is not whether an emergency medical condition existed at the time, but instead whether the hospital had determined that there was an emergency condition. CKMC argues that the medical records and depositions all indicate that neither Mrs. Urban nor any of the health care providers on November 24, 1989, thought that an emergency existed. Since this fact in uncontroverted, defendant argues, summary judgment in favor of CKMC is appropriate.

The court agrees with defendant's interpretation of the statute. With regard to the alleged violation of the stabilization and transfer provision, a party must present evidence that (1) the patient had an emergency medical condition; (2) the hospital actually knew of that condition; (3) the patient was not stabilized before being transferred; and (4) prior to transfer of an unstable patient, the transferring hospital did not obtain the proper consent or follow the appropriate certification and transfer procedures. *Baber v. Hospital Corp. of America,* 977 F.2d 872, 883 (4th Cir.1992).

EMTALA requires a plaintiff to prove that the hospital had actual knowledge of the patient's emergency medical condition. *Id.; see also Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1041 (D.C.Cir.1991) (stabilization and transfer provisions "are triggered only after a hospital determines that an individual has an emergency medical condition"); *Cleland v. Bron-*

*son Health Care Group, Inc.*, 917 F.2d 266, 271 (6th Cir.1990) ("[i]f the emergency nature of the condition is not detected, the hospital cannot be charged with failure to stabilize a known emergency condition").

Plaintiffs argue for a different interpretation of the statute. They contend that while § 1395dd(b) contains language to the effect that it applies only if the hospital determines that an individual has an emergency medical condition, the language of § 1395dd(c) restricts transfers whenever an individual has an emergency medical condition, whether or not it has been recognized as such by the hospital.

This interpretation, however, is contrary to that given to the statute by almost every court addressing the issue (see above citations). While the Tenth Circuit has not yet ruled directly on this issue, it has endorsed the interpretation made by the Circuits cited earlier. *See Collins v. DePaul Hosp.*, 963 F.2d 303, 305 (10th Cir.1992) ("Paraphrasing [42 U.S.C. § 1395dd(a), (b), and (c) ], we read it to require that ... *if the hospital determines* that the individual has an 'emergency medical condition' it must ...") (emphasis added). In addition, every Kansas district court considering the issue has reached the same conclusion. *See Griffith v. Mt. Carmel Medical Center*, 831 F.Supp. 1532, 1544 n. 10 (D.Kan. Aug. 23, 1993) (concluding that plaintiff must show that hospital actually determined that the patient had an emergency medical condition); *Foster v. Lawrence Memorial Hosp.*, No. 91–1151–C, 1992 WL 266888, at *10 (D.Kan. Sept. 11, 1992) ("The Act relies on the hospital's subjective determination that an emergency medical condition exists."); *Nash v. Wilkinson*, No. 89–1544–K, 1992 WL 163666, at *3 (D.Kan. June 19, 1992) ("If the hospital determines that the individual has an emergency medical condition, the hospital must provide further medical examination and treatment as may be required to stabilize the medical condition, or transfer the individual to another medical facility.").

Further, this court does not find such an interpretation to be contrary to the express language of the statute. Although subsection (c) does not contain the language in subsec-

tion (b) regarding the hospital determining that an individual has an emergency medical condition, there is no basis for reading subsection (c) as an independent requirement. Rather, the basic requirements for stabilization and transfer are contained in subsection (b). Subsection (c) contains only the specific rules that a hospital must follow when transferring an individual, and these rules apply only to situations described in subsection (b). The language of subsection (b) specifically refers to the requirements of subsection (c) in the case that a hospital transfers an individual to another medical facility.

Finally, such an interpretation is not contrary to the holding of the Tenth Circuit in *Abercrombie v. Osteopathic Hospital Founders Ass'n*, 950 F.2d 676 (10th Cir.1991). The court in that case held that the statute did not require plaintiffs to prove both that the medical screening examination was inappropriate *and* that the discharge was improper, but that violation of either provision could trigger liability. Here, the requirement of an appropriate emergency medical screening is not at issue.

■ Although the death of one twin and the severe birth defects of the surviving twin indicate that there was at some point an emergency medical condition, plaintiffs have failed to demonstrate that the emergency condition was known at the time Mrs. Urban was sent home on November 24, 1989. The record indicates that neither the nurse who performed the non-stress test nor the physician who gave the telephone order allowing Mrs. Urban to leave the hospital were aware of Mrs. Urban's prior medical history or supposed risk factors. The nurse, Carolyn Ann Wilson, has testified that she believed both the twins and Mrs. Urban were stable on November 24, and that the results of the non-stress test were not a subject of great concern given the readings of the fetal heart strips. Similarly, the physician, Dr. Schukman, testified that based on what he heard over the telephone he believed that the patient was stable, and that there was no threat to the pregnancy.

Plaintiffs have presented no evidence to show that any medical personnel believed there was an emergency medical situation

present on November 24. Instead, plaintiffs attempt to establish a material issue of fact by simply presenting expert opinion testimony that the fetuses were not medically stable at the time Mrs. Urban was sent home.[2] However, analysis by hindsight is not sufficient to impose liability under EMTALA. *Baber,* 977 F.2d at 882.

Plaintiffs' other EMTALA claim relates to Mrs. Urban's transfer on November 25, 1989, from CKMC to Wesley Regional Medical Center in Wichita. Plaintiffs claim that CKMC violated § 1395dd(c) by failing to secure the required written certification that, based on the information available at the time of transfer, "the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the risks" from the transfer. It is uncontroverted that no written certification was completed.

However, the statute as in effect in November, 1989, contains an alternative to the physician certification requirement, namely, if "the patient (or a legally responsible person acting on the patient's behalf) requests that the transfer be effected."[3] 42 U.S.C. § 1395dd(c)(1)(A)(i). Plaintiffs have not disputed the fact that Mrs. Urban requested the transfer to Wichita. The evidence shows that the transfer was made only after she had consulted with her family and given her decision. In addition, the evidence shows no dispute that the transfer was an "appropriate transfer," as required by § 1395dd(c)(1)(B).

## IV. CONCLUSION

Plaintiffs have failed to establish a claim under EMTALA. They have produced no evidence that defendant CKMC had determined that an emergency medical condition existed when CKMC released Mrs. Urban on November 24, 1989, or that CKMC failed to

follow required procedures when it transferred Mrs. Urban to another hospital on November 25, 1989. There are, therefore, no genuine issues of material fact to be determined at trial on this issue of liability under EMTALA.

Plaintiffs' claims against defendants William T. King, M.D., Jay S. Schukman, M.D., and Joseph Gateno, M.D., were brought under state law. Since there was no diversity of citizenship between plaintiffs and these defendants, the court exercised supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a). Now that the claims over which the court had original jurisdiction are dismissed, the court declines to exercise supplemental jurisdiction over the state law claims. 28 U.S.C. § 1367(c). These claims may more properly be adjudicated by a state court. *See Pitts v. Turner and Boisseau, Chartered,* 850 F.2d 650, 653 (10th Cir.1988), *cert. denied,* 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989). Plaintiffs' claims against these defendants are therefore dismissed without prejudice.

IT IS, THEREFORE, BY THE COURT ORDERED that the Motion for Summary Judgment filed by defendant Central Kansas Medical Center (Doc. 232) is granted.

IT IS FURTHER ORDERED that plaintiffs' state law claims against defendants William T. King, M.D., Jay S. Schukman, M.D., and Joseph Gateno, M.D., are dismissed without prejudice.

The case is dismissed.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**

2. In its reply brief, defendant has objected to the affidavits executed by plaintiffs' expert witnesses both as to their content and that they set forth opinions not fairly disclosed during discovery. Since the court is granting the summary judgment motion, these issues need not be addressed.

3. The current version of that section reads, "the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section

and of the risk of transfer, in writing requests transfer to another medical facility." This section was amended on December 19, 1989, by P.L. 101–239, and the amendments took effect on July 1, 1990. These amendments are not applicable to the case at bar. *See Stevison v. Enid Health Systems, Inc.,* 920 F.2d 710, 713 n. 3 (10th Cir.1990); *Brooker v. Desert Hosp. Corp.,* 947 F.2d 412, 415 n. 1 (9th Cir.1991).